## Broadwater, Appellant, v. Otto.

Argued April 17, 1952. Before DREW, C. J., STEARNE, JONES, BELL and MUSMANNO, JJ.

*Louis H. Wilderman,* with him *Richman & Richman,* for appellants.

*Robert T. McCracken,* with him *C. Russell Phillips* and *Montgomery, McCracken, Walker & Rhoads,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, May 29, 1952:

The decisive question is whether a *discharged* prison guard possesses the status to require and participate in grievance procedure under the Act of June 30, 1947, P. L. 1183, 43 PS 215.1.

The title to the Act of 1947, supra, reads: "Relating to strikes by *public employes;* prohibiting such strikes; providing that such employes by striking terminate their employment; providing for reinstatement under certain conditions; providing for a *grievance procedure;* and providing for *hearings before civil service* and *tenure authorities,* and in certain cases before *the Pennsylvania Labor Relations Board.*" (italics supplied)

Section 1 (b) reads: "In order to avoid or minimize any possible controversies by making available full and adequate governmental facilities for the adjustment of grievances, the governmental agency involved, at the request of public employes, shall set up a panel of three members, one to be selected by the employes, one by the governmental agency, and the two so selected to select a third member."

It is also provided in this section: ". . . the panel shall make their findings, copy of which shall be sent

to the Governor, to the General Assembly, and to the head of the agency, or political subdivision involved. Upon receipt of the findings of the panel the Governor or the head of the State agency or political subdivision involved may take administrative measures to remedy the complaints. If the Governor or the head of the State agency or political subdivision finds that the situation complained of can only be remedied by legislative action, the Governor may refer the matter to the Legislature for correction, or the head of the State agency or political subdivision may refer the matter to the proper law-making body."

Robert C. Broadwater and Chester L. Alburger, guards at the Philadelphia County Prison, instituted an action in mandamus against the members of the Board of Inspectors, Philadelphia County Prison, seeking to compel them to appoint a panel member under the act. The Board of Prison Inspectors decline so to appoint on the ground that the provisions of the act apply only to existing employes and not to those who have been discharged. Upon a trial by a judge without a jury, a verdict for the defendants was rendered. Exceptions were dismissed in an opinion by the court in banc. This appeal followed.

The question of law, as above indicated, is whether *discharged* employes may require grievance procedure as provided by the act. We are presently not concerned with the *merits* of the case. Should the act not apply, that ends the case. Should, however, the act apply, then appellants would possess the right to insist upon the erection of a panel to hear the grievances relative to the *discharges*.

There is absent any question concerning the right of a public employe to *strike*. No such right is claimed by appellants. The famous words, now part of cherished American tradition, are: *"There is no right to*

*strike against the public safety by anybody, anywhere, anytime."* Section 2 of the act makes striking by a public employe *malum prohibitum.* This section reads: "Section 2. No public employe shall strike and no person exercising any authority, supervision or direction over any public employe shall have the power to authorize, approve or consent to a strike by one or more public employes."

And furthermore, appellants do not contend that they are governed by the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, as amended, 43 PS 211.1 et seq. Prison guards are not engaged in an *industrial dispute,* to which the act exclusively applies: *Salvation Army Case,* 349 Pa. 105, 36 A. 2d 479.

In *Ruch v. Wilhelm, Commissioner, et al.,* 352 Pa. 586, 43 A. 2d 894, this Court said (p. 588): "Under the common law, therefore, [public employes] are subject, like all other Commonwealth employes, to removal at the pleasure of the appointing power, either for cause or without cause, unless there is legislative provision to the contrary: Glessner's Case, 289 Pa. 86, 90, 91, 137 A. 166, 167, 168. They have such rights, and only such, regarding the tenure of their positions, as some statute may accord to them. . . ."

See the act of April 14, 1835, P. L. 232, 61 PS 624, et seq. Section 4 (61 PS 626) reads: ". . . The superintendent, under direction and advice of the board of inspectors, shall appoint the keepers, and necessary servants, and dismiss them whenever he thinks proper, or the inspectors direct him to do so. . . ."

In an opinion dated April 13, 1950, by the Attorney General of Pennsylvania (now Mr. Justice THOMAS MCKEEN CHIDSEY of this Court), to Mr. Patrick A. McCabe, Pennsylvania State Employees Council, (not reported), (attached to appellees' paper book) the

present problem was accurately and comprehensively encompassed. The following are excerpts from the opinion: "Where the Civil Service Act applies, as in the case of the Bureau of Unemployment Compensation of the Department of Labor and Industry, the Department of Public Assistance and the Pennsylvania Liquor Control Board, for instance, hearings for dismissed employes are provided for. In the absence of a statutory provision, all Commonwealth employes are subject to removal at the pleasure of the appointing power, either for cause or without cause. This was true at common law and has always been true under the law of Pennsylvania. . . .

". . . Section 5 provides for a hearing after termination of employment on the ground of violation of the act (1) where the public employe is entitled 'by law' thereto, the words 'by law' patently meaning a hearing provided by the Civil Service Act or other law, and (2) where the public employe is not provided a hearing 'by law'—in such case a hearing being given before the Pennsylvania Labor Relations Board. However, in either case the scope of the hearing is merely to determine *'whether the provisions of this act have been violated by such employe . . . ,'* that is, he is afforded opportunity to establish that his failure to report for duty or otherwise absent himself or abstain from the full, faithful and proper performance of his position was because of sickness, leave of absence or other good reason. No hearing is provided in this section of the act or elsewhere to review a dismissal on any other ground than striking, as defined.

"The grievance procedure contained in Section 1 (b) of the act providing for the appointment of a panel to hear grievances and report findings to the Governor, the General Assembly and the head of the State agency involved, clearly contemplates a grievance by an em-

ploye *'holding a position'* as a 'public employe,' as defined in Section 1 (a) of the act. The grievance procedure relates to . . . the conditions or compensation of public employment, or the betterment thereof . . . .' It is quite clear that the grievance machinery was to provide for presentation of complaints respecting working conditions and compensation by those in employment and affected thereby, and the consideration of such complaints *during employment* in order to deter strikes in accordance with the over-all purpose of the legislation." (italics supplied in final paragraph)

Public employes while prohibited from *striking* are not prevented from the formation of employe unions or restricted from lawful activities therein. Under the Act of 1947, supra, such public employes do not possess the status entitling them to require and to participate in grievance procedure under the act *after* they have been discharged. Such a privilege is only accorded under express statutory fiat.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The plaintiffs in this case do not question that the Superintendent of Prisons has the right, under the Act of April 14, 1835, to hire and dismiss employes of the prison. I would say that even if the Act did not confer upon him this authority, it would be his because of the intrinsic nature of his duties, which require never-failing vigilance. The keeper of a prison, the inhabitants of which are necessarily men prone to disobedience and potential violence, must have employes who are steadfastly loyal to him and to his trust, and who can be depended on to display courage and strength in any given crisis or emergency. He, therefore, in the dis-

charge of his great responsibilities, should not be restricted in the choosing, suspending and dismissing of employes.

But the immediate right of the Superintendent of Prisons to discharge prison guards is not involved in this litigation at all. What is before us is the right of a labor union to be heard on a specific grievance.

On December 6, 1950, members of the Philadelphia County, Pennsylvania Prisons Employees, Local 620, American Federation of State, County and Municipal Employees, A. F. of L., wrote the Board of Prison Inspectors of the Philadelphia County Prisons, requesting that a panel be appointed under the provisions of the Act of June 30, 1947, P. L. 1183, to hear their grievances having to do with job security, recognition of labor union, activities of labor union members and the discharge of the two plaintiffs, Robert C. Broadwater and Chester L. Alburger. The defendants declined to cooperate in the procedure set up by the Act referred to. They made no answer to the request of the employes for a panel hearing on the subject of job security and labor union recognition, and, with regard to the discharge of the two plaintiffs, contented themselves with averring that the plaintiffs were not entitled to a hearing since they were no longer employed as prison guards.

The majority opinion supports the position of the defendants and states: "We are presently not concerned with the *merits* of the case." But why shouldn't we be concerned with the *merits* of the case?

A duly constituted labor union, under a definite procedure outlined by a Pennsylvania statute, has made serious charges of unfair labor practices against the defendants. In its letter of December 6, 1950, the labor union charges that the defendants are attempting to impair the rights of its employes to join a labor

union. The union claims further that two employes were discharged because they were active in the formation and continued existence of a labor union. These declarations amount to nothing less than the very serious accusation that the defendants are attempting to destroy the machinery of collective bargaining. This they have no right to do under the law of the land. How can we then refuse to consider the merits of a controversy which revolves around the vital issue as to whether, in today's jurisprudence, any employer can deny an employe the right to join and belong to a labor union?

It may be that the plaintiffs' averments made under oath cannot be substantiated, but the Court cannot simply, without any evidence to the contrary, assume the averments to be false. I do not know whether they are true or not. If they do not represent fact, I would dismiss the Complaint, but I cannot make a decision on mere speculation and guesswork. The Act of 1947 supplies a lamp to illuminate controversies of this character between management and employes, but the lamp here has never been lighted—and I refuse to make a decision in the dark.

The majority opinion states: "There is no right to strike against the public safety by anybody, anywhere, anytime." I agree with that statement as I agree with the Ten Commandments and the Declaration of Independence, but that proposition is not involved here at all. The plaintiffs did not go out on strike. The plaintiffs were *discharged*. For the defendants to say, as they do, that employes are on strike when they are denied access to their jobs is to impart a strange interpretation to the word "strike." A strike is a voluntary collective cessation of work. It is the laying down of tools. The defendants here snatched the tools from the hands of the plaintiffs and ordered them out,

and against the attempted return of the plaintiffs to the workshop, the door is shut in their faces. To call that situation a strike is to use language haphazardly.

But if the majority opinion approves the defendants' contention that the plaintiffs are on strike, then the employes are definitely entitled to a panel hearing. Attorney General CHIDSEY's opinion, quoted in the majority opinion, specifically states the following: "No hearing is provided in this section of the act or elsewhere to review a dismissal on *any other ground than striking,* as defined." (Italics supplied.)

But whether the plaintiffs were properly or improperly discharged is not the most serious issue in this case. The very serious and grave proposition involved here is the *nullification* of the Act of June 30, 1947. This Act provides, as the majority opinion shows, that when public employes so request, the governmental agency involved (in this case the Prison Board of Inspectors) *shall* set up a panel of three members. This direction is mandatory. If the Prison Board may avoid this categorical mandate of the Legislature by the device of discharging aggrieved employees before they have an opportunity to articulate their request for a panel, the Act of June 30, 1947, becomes meaningless.

Under the majority opinion an employer may always deny an employe the right to a hearing by the simple expedient of discharging him and then asserting he has no standing because he is not an employe. Suppose the superintendent in this case had said in so many words to Alburger and Broadwater: "I discharge you because you are members of a labor union and I will not tolerate any union men working for me." Would this Court say that Alburger and Broadwater, under those circumstances would not be entitled to a panel hearing because they were no longer employes?

According to the majority opinion the superintendent could discharge the entire force of prison guards because they are members of a labor union, but the guards would have no recourse under the Act because they would then be no longer employes.

How does the purpose of the Act of June 30, 1947, differ from the purpose of the Pennsylvania Labor Relations Act of June 1, 1937, which aims at peaceable settlement of all labor disputes? If the Prison Board in this case can be authorized to ignore the specific direction of the Act of 1947, private employers can also discharge union employes and then with logic argue that they are not required to submit to amicable machinery provided by the Pennsylvania Labor Relations Act and contracts drawn under its aegis, since the complainants are no longer employes.

This decision can give sanction to one of the most dangerous practices that can possibly arise in labor relations. In spite of temporary inconveniences and even hardships resulting from transitory disagreements between employers and employes in the private industrial world, there is a greater stability and orderliness to the entire complex life of today than ever existed in the chaotic, irresponsible pre-union days when both employers and employes were not bound by contract or law to any continuity in production or service to the public.

Congress and every legislature in the United States have now recognized that recognition of labor union makes for peace, progress and prosperity for all concerned. And statutes aimed at establishing more peaceful relations between employers and employes are to be encouraged in the fulfillment of that ideal.

In asserting that public employes have no right to protest through the medium of mass cessation of work, against unfair or unjust treatment, the Legislature of

Pennsylvania recognized the need to provide a vehicle for the airing of employes' grievances if and when they should arise. It accordingly established the machinery for a panel which, made up of three members, would provide for hearing of grievances with a report to be made to the Governor, the General Assembly, or head of the agency or political subdivision involved.

To deny Alburger and Broadwater the right to be heard under this Act is like charging a soldier with a serious offense and discharging him dishonorably, but denying him a courtmartial trial in which he might have an opportunity to establish his innocence.

Alburger and Broadwater may have done everything that the Prison Board charges them with. I renounce any possible interpretation of defending what they are charged with having done or not done. After six years' service in the military forces of the United States, I recognize the absolute need for strict discipline in military and quasi-military organizations, but I recognize also the possibility that the two plaintiffs may be innocent. If Alburger and Broadwater are as guilty as the defendants charge, a panel hearing will establish that fact. An impartial hearing under the machinery provided by the Act will also quickly decide whether the labor union has been threatened by the defendants or not. The time and expense required for such a hearing would be insignificant in comparison to the great general harm which is possible as a result of an affirmance of the lower court's decision.

The majority opinion says that after an employe has been discharged he has no right to participate in the grievance procedure under the Act of June 30, 1947. I say that *that* is when he has the *greatest* right to participate in the grievance procedure under the Act in question. In nine cases out of ten, that is when the question arises: *after* the employe has been discharged.

While he is still employed there may be no grievance for him to complain about. It is the very discharge which gives him his ·grievance. It is *after* a man has been hurt that he goes into court, not before.

I dissent.