Gerald T. DeWALT, Plaintiff,

v.

James D. BARGER, Individually; R. O. Wellendorf, Individually; Dr. Robert Wilburn, in his official capacity as Secretary of the Office of Administration of the Commonwealth of Pennsylvania; Howard Roath, as Director of the Bureau of Personnel of the Commonwealth of Pennsylvania, Defendants.

Civ. A. No. 75–1015.

United States District Court, M. D. Pennsylvania.

May 27, 1980.

Paul C. Vangrossi, Norristown, Pa., for plaintiff.

David Max Baer, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants.

## OPINION

RAMBO, District Judge.

## I. *INTRODUCTION*

The complex procedural history of this case dictates a detailed introduction. On May 14, 1975, plaintiff filed a complaint in which the following were named as defendants:

1. The Pennsylvania State Police;
2. Colonel James D. Barger, individually and in his capacity as Commissioner of the Pennsylvania State Police;
3. Milton J. Shapp, individually and in his capacity as Governor of the Commonwealth of Pennsylvania;
4. Ronald G. Lench, individually and in his capacity as Secretary of the Office of Administration of the Commonwealth of Pennsylvania;
5. Richard Madison, individually and in his capacity as Director of the Bureau of Personnel of the Commonwealth of Pennsylvania;
6. Lieutenant Matthew Hunt, Captain Robert Shuck, Major Roy Titler and Lieutenant Colonel R. O. Wellendorf, individually and in their respective capacities as Operational Supervisors within the Pennsylvania State Police.

The complaint alleged that these defendants had violated the rights of plaintiff arising under the following constitutional provisions and statutes:

1. The fifth amendment;
2. The sixth amendment;
3. The due process clause of the fourteenth amendment;
4. 42 U.S.C. § 1983;
5. 42 U.S.C. § 1985(3).

An answer was filed by defendants on September 11, 1975, followed by a motion for summary judgment filed on April 1, 1976.

In the court's memorandum and order dated July 30, 1976, the complaint was dismissed as to the Pennsylvania State Police; the complaint was dismissed to the extent it sought retroactive damages (including punitive damages and back pay) from defendants Lench and Madison; and the entire complaint was dismissed with respect to defendant Shapp. Several trial dates were established only to be continued for various and sundry reasons. The trial was ultimately commenced on October 29, 1979. On October 31, 1979, in an order given from the bench, defendants Hunt, Shuck, and Titler were dismissed.

In addition to those dismissals, two substitutions were stipulated to by the parties on October 29, 1979. Dr. Robert Williams was substituted, in his official capacity only, for defendant Lench,[1] and Howard Roath, was substituted, in his official capacity only, for defendant Madison.[2] The end result being that the following individuals are being sued in their designated capacities:

1. James D. Barger, individually;[3]
2. R. O. Wellendorf, individually;[4]
3. Dr. Robert Wilburn, in his official capacity as Secretary of the Office of

---

1. On page 65 of the transcript, defendant Lench was dismissed and defendant Wilburn was substituted in his official capacity only.

2. On page 65 of the transcript, defendant Madison was dismissed and defendant Roath was substituted in his official capacity only.

3. James D. Barger no longer holds the position of Commissioner of the Pennsylvania State Police, having resigned on February 17, 1977. (Tr. p. 194).

4. R. O. Wellendorf no longer holds the position of Lieutenant Colonel in the Pennsylvania State Police, having retired in July, 1976. (Tr. p. 261).

Administration of the Commonwealth of Pennsylvania;

4. Howard Roath, as Director of the Bureau of Personnel of the Commonwealth of Pennsylvania.

The non-jury trial ended on October 31, 1979 and both sides were ordered to submit proposed findings of fact and conclusions of law after receipt of the transcript.

## II. *FINDINGS OF FACT*

1. Gerald DeWalt joined the Pennsylvania State Police on February 1, 1951. Tr. p. 11.

2. From January 2, 1973, until February 17, 1977, James Barger was Commissioner of the State Police. Tr. p. 194.

3. From January 15, 1973 until the time of his retirement in July 1976, Roy Wellendorf was Deputy Commissioner of the Pennsylvania State Police. Tr. p. 66.

4. In January of 1973, Helen Jean Lutz was Secretary to Deputy Commissioner Wellendorf of the State Police. Tr. p. 135.

5. In the Fall of 1972, Major Roy Titler worked for the Pennsylvania Department of Justice and was in charge of investigations. All state policemen who worked with the Crime Commission at that time, including Gerald DeWalt, worked under his direction. Tr. p. 178.

6. Plaintiff and Rocco Urella, Commissioner of the State Police in November 1972, had been friends for some time prior to November, 1972. Tr. p. 47.

7. Commissioner Urella was not plaintiff's immediate superior in November 1972. Tr. pp. 46–47.

8. In October and November 1972, plaintiff received several telephone calls from Corporal Kardash of the State Police. Despite the fact that he was assigned to the Crime Commission at the time, plaintiff provided information to Corporal Kardash concerning his activities at the George Washington Motor Lodge. Tr. p. 49.

9. On the evening of November 27, 1972, wires were discovered in the George Washington Motor Lodge in the crawl space of the room which plaintiff had mentioned to Corporal Kardash. Tr. pp. 43, 101–02.

10. On the morning of November 28, 1972, plaintiff made a phone call to warn Commissioner Urella of the discovery of the wires. He did this by calling his wife and directing her to call a telephone number he had given her, and instructed her to relay the message that the Crime Commission had discovered the wires and to "get the guys out." D. Ex. 1; Tr. pp. 139, 99–102, 46, 50.

11. Plaintiff took this action without discussing the matter with Corporal Bugjo, Sergeant Hunt or Captain Titler, his immediate superiors at the Crime Commission. Tr. p. 47.

12. On the evening of November 28, 1972, plaintiff talked by telephone with Mrs. Sobrecht, co-owner with Commissioner Urella of the Sentinel Motel. D. Ex. 1; Tr. pp. 99–102.

13. The investigation of events at the George Washington Motor Lodge by the Pennsylvania State Police was initially administrative and not criminal in nature. Tr. pp. 131, 206, 236, 244.

14. On January 31, 1973, plaintiff was questioned by Captain Shuck and Sergeant Hussack concerning his involvement in the wiretap incident. Tr. p. 51.

15. This questioning occurred over a period of approximately three hours, from 11:00 a. m. until 2:00 p. m. Tr. p. 130.

16. After taking a break for approximately one hour for sandwiches and coffee, a stenographer, Helen Jean Lutz, was summoned. Mrs. Lutz then recorded a verbatim question and answer session between Captain Shuck and plaintiff, a copy of which is defendant's exhibit 1 in this case. Tr. pp. 102–03, 124, 130–31, 135, 51.

17. While plaintiff became emotional at times during the meeting with Captain Shuck and Sergeant Hussack on January 31, 1973, at the time the verbatim statement was taken, he appeared composed and under no undue strain. Tr. pp. 131, 134, 136, 298–99.

18. Captain Shuck and Sergeant Hussack did not harass, abuse or otherwise speak in an abnormal voice toward plaintiff

during the afternoon session on January 31, 1973. Tr. p. 136.

19. Plaintiff's statements to Captain Shuck and Sergeant Hussack on January 31, 1973, both prior to and after the time a stenographer was called into the room, were voluntarily made, not under coercion. Tr. pp. 131, 134, 136.

20. After talking with Captain Shuck and Sergeant Hussack on January 31, 1973, plaintiff talked briefly with Deputy Commissioner Wellendorf. The Deputy Commissioner stated to plaintiff at that time that he thought plaintiff's resigning would be a big mistake because he had many years of service with the State Police. The Deputy Commissioner arranged for plaintiff's transfer to Troop N in Hazelton at plaintiff's request. Tr. pp. 264, 51–52.

21. Deputy Commissioner Wellendorf and Captain Shuck made arrangements after their discussions with plaintiff on January 31, 1973, for someone to pack up his belongings at the George Washington Motor Lodge and have them delivered to his home or his troop so that he would not have to return to the Motor Lodge and face the men. Tr. pp. 105, 116, 51.

22. Major Robert Rice was assigned in February 1973, to act as Trial Judge Advocate in the upcoming court-martial proceedings against three members of the State Police, including Corporal Kardash. Tr. pp. 108–09.

23. On or about February 1 or 2, 1973, Major Shuck and Major Rice met with plaintiff at Departmental Headquarters. At that time, they reviewed with plaintiff his statement of January 31, 1973. Plaintiff told Major Rice and Major Shuck that he would testify at the court-martial to be held on March 27, 1973. Tr. pp. 108–09, 52–53.

24. On February 16, 1973, Captain Shuck and Trooper Pat Malone went to plaintiff's residence and talked with plaintiff and his wife about the events in November 1972. Tr. pp. 109, 111, 148.

25. On March 5, 1973, Major Shuck went to the DeWalt's residence to serve them with subpoenas for the court-martial. At that time, he gave Mrs. DeWalt a copy of her statement of February 16, 1973, and asked plaintiff if he wanted a copy of his statement of January 31, 1973, defendant's exhibit 1, which he had with him. Plaintiff stated that he did not wish to see that statement. Tr. p. 112.

26. At no time prior to the court-martial on March 27, 1973, was Major Shuck aware that plaintiff would refuse to testify on Fifth Amendment grounds. Tr. pp. 52–53.

27. On March 27, 1973, plaintiff was called by the State Police Trial Judge Advocate to testify against three fellow State Troopers reputedly involved in an illegal wiretap operation at the George Washington Motor Lodge, King of Prussia, Pennsylvania. P. Ex. 13.

28. At the court-martial, plaintiff was given a copy of his statement of January 31, 1973, which he had not wished to see on February 16, 1973. Tr. pp. 14, 112; P. Ex. 13.

29. At the court-martial, plaintiff, upon advice of his counsel, Francis Lord, Esquire, elected not to testify and invoked his right against self-incrimination under the Fifth Amendment of the United States Constitution. P. Ex. 13.

30. Having so raised his rights under the Fifth Amendment of the United States Constitution, the plaintiff was excused as a witness at the court-martial. P. Ex. 13.

31. While plaintiff refused to testify in State Police proceedings on March 27, 1973, he did testify at some length concerning the events of November 27 and 28, 1972 before a Legislative Committee on May 3, 1973. Tr. pp. 55, 13, 15; P. Ex. 13.

32. After the court-martial proceeding on March 27, 1973, Major Rice, the Trial Judge Advocate, called Commissioner Barger, advised him that plaintiff had refused to testify at the court-martial although he had previously provided information, and requested that the Commissioner suspend him pending an investigation. Tr. pp. 194–95, P. Ex. 1.

33. After receiving the call from Major Rice on March 27, Commissioner Barger

called Deputy Commissioner Wellendorf and instructed him to have plaintiff suspended from duty pending an investigation into his conduct. Tr. pp. 195, 264–265; P. Ex. 2.

34. After receiving Commissioner Barger's call on March 27, 1973, Deputy Commissioner Wellendorf talked by telephone with Lieutenant Peters in Hazleton and instructed him to suspend plaintiff pending an investigation. Tr. p. 265; P. Ex. 4.

35. On the night of March 27, 1973, plaintiff was called to the Lehighton Barracks and was notified by Lieutenant Peters that he was being suspended indefinitely. Tr. p. 16; P. Ex. 1.

36. On the morning of March 28, 1973, Deputy Commissioner Wellendorf prepared a memorandum to be sent to plaintiff to confirm his suspension pending the outcome of an investigation of his conduct in connection with the court-martial proceedings. This memorandum, Plaintiff's Exhibit 3, was delivered to plaintiff on March 28, 1973, by Sergeant William Harfman. Tr. pp. 265, 198; P. Ex. 7.

37. On March 28, 1973, Commissioner Barger received a memorandum from Major Rice confirming his telephone call of March 27, and specifically stating that plaintiff's refusal to testify constituted a violation of the State Police Code of Conduct. Tr. p. 197; P. Ex. 1.

38. On March 28, 1973, the Commissioner sent a memorandum to the Deputy Commissioner confirming the telephone call of March 27. This memorandum specifically noted that Major Rice felt that plaintiff's conduct was in violation of the Code of Conduct. Tr. pp. 198, 265; P. Ex. 2; D. Ex. 2.

39. On March 28, 1973, Deputy Commissioner Wellendorf wrote a memorandum to Lieutenant James Regan, Division Director, Bureau of Criminal Investigation, assigning him to conduct an investigation into plaintiff's conduct in connection with the court-martial proceedings. Tr. pp. 266, 160–61; P. Ex. 4.

40. As a result of this instruction, Lieutenant Regan conducted an investigation, considering, *inter alia*, plaintiff's statement of January 31, 1973, Defendants' Exhibit 1, and plaintiff's testimony or lack of it at the court-martial proceedings, Plaintiff's Exhibit 13 in this case. Tr. pp. 161–64.

41. As a result of Lieutenant Regan's investigation, he concluded that plaintiff had failed to produce information requested of him during court-martial proceedings, opting to take the Fifth Amendment instead, and recommended that the matter be submitted to a disciplinary board for consideration of further disciplinary action against plaintiff. Tr. pp. 164–65.

42. Lieutenant Regan concluded that plaintiff's conduct during the court-martial proceedings constituted a violation of the State Police Code of Conduct, found as Defendant's Exhibit 2. Tr. pp. 165–66.

43. Lieutenant Regan's conclusions were based in part on his belief that a member of the State Police who took the Fifth Amendment was in violation of Section 1.01 (Deportment) of the Code of Conduct, found in Defendants' Exhibit 2. Tr. pp. 171–73.

44. Lieutenant Regan's conclusions were based on his understanding of the law at the time, including the case of *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, which he understood to mean that a member of a police agency was entitled to exercise his Fifth Amendment rights, but because he occupied a position of public trust, could not do so and maintain his public employment. Tr. p. 169.

45. As a result of the recommendations of Lieutenant James Regan, Commissioner Barger, on April 5, 1973, ordered the convening of a disciplinary board to investigate plaintiff's conduct at the recent court-martial proceedings and in connection with information supplied by him concerning the alleged wiretapping incident. Tr. p. 198; P. Ex. 5.

46. On April 6, 1973, a board of inquiry was held which reviewed the facts of plaintiff's case. The board, while stating that no provision of the Disciplinary Code had been expressly violated, found plaintiff's conduct did not warrant court martial. The board

recommended that Trooper DeWalt be suspended because he had conducted himself in a manner which did not reflect favorably on the State Police, and because he had engaged in a course of conduct tending to bring the force into disrepute and reflecting discredit upon himself as a member of that force. Tr. p. 199; P. Ex. 6.

47. There were requirements in the regulations of the State Police at that time that a trooper be notified of any alleged violations of deportment rules or regulations for which he may be court-martialed. The convening of a disciplinary board itself, however, did not require notice to the accused. Tr. pp. 199, 267; P. Ex. 11.

48. Plaintiff was never advised by the Pennsylvania State Police of the findings and conclusions of the board of inquiry. Tr. p. 35.

49. The State Police regulations, then and there in effect, provided for no punitive or disciplinary action to be taken against a State Policeman specifically for invoking his rights under the Fifth Amendment, although such conduct may have violated a general regulation. P. Ex. 11.

50. Commissioner Barger usually complied with the recommendations of a disciplinary board or court-martial board. Tr. p. 210.

51. On May 2, 1973, Commissioner Barger, acting on the recommendation of the Board of Inquiry No. 12, directed that Major Robert Rice initiate a disciplinary action report against Trooper DeWalt recommending a six week suspension without pay and an inter-troop transfer, as evidenced by Plaintiff's Exhibit 8. This action was also based on discussions with other persons involved in the alleged administrative investigation. Tr. pp. 207–8; P. Ex. 8.

52. Under the regulations of the Pennsylvania State Police, suspension without pay was proper punitive measures to be taken for violation of the rules and regulations of the State Police. Tr. p. 257; P. Ex. 11.

53. On May 2, 1973, Major Rice initiated the Disciplinary Action Report, Plaintiff's Exhibit 10, against plaintiff. P. Ex. 10.

54. According to the Disciplinary Action Report, discipline was recommended for plaintiff for two reasons. First, he discovered that Crime Commission telephones were being wiretapped at the George Washington Motor Lodge. Believing that Corporal Metro Kardash was involved, he then made a telephone call to his wife and instructed her to notify Colonel Urella of the State Police and get the message to him to get the men out of the motel. These activities of November 28, 1972, were cited as being violations of the Pennsylvania State Police Field Regulations (hereinafter FR) 1–2, Section 2.08–C, and FR 1–2, Section 2.22, of the Code of Conduct, found as Defendants' Exhibit 2. Second, plaintiff gave a statement detailing his involvement in the events of November 28, 1972, and stated to Captain Robert Shuck and others that he would testify to that effect. However, after being sworn to testify at court-martial proceedings of several state policemen, including Corporal Metro Kardash, he refused to testify asserting a Fifth Amendment right. His refusal to testify was in conflict with his previously stated intention. These actions were cited in the Disciplinary Action Report as a violation of FR 1–1, Section 1.01 of the Code of Conduct. D. Ex. 2.

55. Deputy Commissioner Wellendorf concluded after a review of the investigative report that plaintiff had violated all three sections cited in the Disciplinary Action Report, admitted as Plaintiff's Exhibit 10. Tr. p. 272.

56. Deputy Commissioner Wellendorf believed that plaintiff's conduct as set forth in the Disciplinary Action Report constituted a violation of the Deportment section of the Code of Conduct, FR 1–1, Section 1.01 because his action in giving a statement, agreeing to testify, and then later refusing to so testify, was conduct unbecoming a member of the State Police. Tr. p. 274; D. Ex. 2.

57. At the time of the approval of the Disciplinary Action Report, Deputy Commissioner Wellendorf prepared a memorandum to Trooper DeWalt stating that he was approving the initiating officer's recom-

mendation for a six week suspension without pay and an inter-troop transfer, that the suspension without pay was retroactive to March 28, 1973, and terminated on May 9, 1973, and that he was to return to duty on May 10, 1973. Tr. p. 269; P. Ex. 7.

58. On or about April 25, 1973, the plaintiff met with Commissioner Barger to discuss his suspension and contemplated resignation from the Pennsylvania State Police. Tr. pp. 22–23, 203.

59. At this meeting with Commissioner Barger, plaintiff demanded a court-martial and hearing on the charges upon which his suspension was purportedly based. Plaintiff was advised by Commissioner Barger that he was not going to be given a court-martial. Tr. p. 26.

60. Plaintiff came to Deputy Commissioner Wellendorf's office on May 8, 1973, and was handed a copy of the Disciplinary Action Report, Plaintiff's Exhibit 10, and told that he would be transferred to Washington, Pennsylvania. Tr. pp. 269–70, 57, 66.

61. Lieutenant Colonel Wellendorf stated on cross-examination that this transfer to Washington, Pennsylvania was part of the punitive action. Tr. p. 67.

62. Deputy Commissioner Wellendorf told plaintiff at their meeting on May 8, 1973, that he could either sign the Disciplinary Action Report and accept the discipline imposed or take an appeal. Tr. p. 279.

63. The Disciplinary Action Report admitted as Plaintiff's Exhibit 10 contains two options: (1) accept the disciplinary action, or (2) appeal the disciplinary action. Plaintiff did not choose to check either block on Plaintiff's Exhibit 10. Tr. pp. 271, 56; P. Ex. 10.

64. The State Police rules and regulations then and there in effect provided a right of appeal to an aggrieved State Police Officer to the immediate superior of the Officer filing the Disciplinary Action Report. Lieutenant Colonel Wellendorf's immediate superior was Commissioner Barger. P. Ex. 11 (FR 3–3.05); Tr. pp. 279–280.

65. The appeal procedures of a Disciplinary Action Report are found in the Field Regulations of the Pennsylvania State Police. All members of the State Police receive these regulations, as well as any amendment or supplements thereto. Tr. p. 63.

66. Had plaintiff appealed the disciplinary action recommended by the Disciplinary Action Report, and had he been successful, the inter-troop transfer would have been rescinded and he would have received back pay for the six weeks suspension. Plaintiff was aware that a successful appeal by him would have resulted in the rescission of all punitive action. Tr. pp. 271–72, 71–72.

67. Plaintiff never attempted to formally appeal the disciplinary action imposed in plaintiff's exhibit 10 by marking the appeal box and signing the form. Tr. p. 56; P. Ex. 10.

68. The plaintiff concluded that the action of the State Police as described in the Disciplinary Action Report, P. Ex. P–10, was final and that any appeal to the next higher authority as provided in the State Police rules and regulations would be frivolous because the person who authorized the institution of the action by the disciplinary board was Colonel Barger, the person who would also hear the appeal from the action taken in that report. Tr. pp. 279–280.

69. Plaintiff did not avail himself of the request for a special investigation pursuant to FR 3.02(c) in effect at the relevant time. P. Ex. 11.

70. On April 17, 1973, Major Roy Titler was informed he had been called by plaintiff. When he returned home, he called plaintiff, at which time plaintiff said he was upset, that he was going to quit, and that he was suspended and was going to be transferred. Major Titler offered to talk to Commissioner Barger to see if he, plaintiff, could be transferred with Major Titler, who was being transferred to Butler within the next several days. He offered plaintiff to make arrangements so that they could travel together. While talking with Major Titler on or about April 17, 1973, plaintiff stated that he would like to talk with Commissioner Barger. Major Titler responded

that that was not a problem and he would make arrangements for such a meeting. Tr. pp. 182–83.

71. Major Titler called the Commissioner after talking with plaintiff on April 17 and told him that plaintiff was going to resign from the State Police and that he wanted to talk to the Commissioner. The Commissioner told Major Titler to have him contact his Administrative Secretary, Mrs. Wise, and she would set up an appointment for him. In his phone call concerning Trooper DeWalt's desire to meet with the Commissioner, the only message given to Major Titler for plaintiff from Commissioner Barger was the information as to whom to contact to set up an appointment. Tr. pp. 203, 183, 21.

72. On April 18, Major Titler called plaintiff to tell him that, in response to his request, Commissioner Barger had agreed to meet with him. Tr. pp. 183, 189, 21.

73. Major Titler made arrangements for plaintiff to be driven to Harrisburg to meet with Commissioner Barger on April 25, 1973. Tr. pp. 190, 21.

74. On April 25, 1973, Trooper DeWalt came to the Commissioner's office and the two met for approximately 30 minutes. During their discussion, Commissioner Barger stated that he did not think law enforcement officers should take the Fifth Amendment concerning their official duties; that a Disciplinary Action Board had recommended his suspension; that he would not go contrary to that recommendation; and that he was being treated the same as any other trooper would be treated. Tr. pp. 204–5.

75. The only direct contact Commissioner Barger had with plaintiff while he was a member of the State Police was on April 25, 1973. Tr. pp. 203, 214.

76. The only times Deputy Commissioner Wellendorf met with plaintiff while he was a member of the State Police were on January 31, May 8 and May 9, 1973. Tr. p. 274.

77. In their brief meeting on January 31, 1973, Deputy Commissioner Wellendorf tried to talk plaintiff out of resigning and made arrangements, in keeping with plaintiff's wishes, for him to be transferred to Hazleton. Tr. p. 264.

78. Shortly before May 8, 1973, Deputy Commissioner Wellendorf called plaintiff to inform him to come to the Deputy Commissioner's office on May 8, 1973, to discuss his return to duty. Tr. p. 268.

79. In their meeting on May 8, 1973, Deputy Commissioner Wellendorf informed him of the disciplinary action as stated above.

80. On May 9, 1973, plaintiff returned to Deputy Commissioner Wellendorf's office and informed him that he was resigning. The Deputy Commissioner again tried to talk him out of it but plaintiff had made up his mind. Colonel Wellendorf then arranged for plaintiff to see Major Hileman, their Personnel Officer, to give him whatever assistance he needed. Tr. p. 274.

81. On May 9, 1973, plaintiff resigned from the State Police. Tr. pp. 274, 35, 37, 57; P. Ex. 9.

82. In plaintiff's letter of resignation on May 9, 1973, he stated that his reasons for resigning were personal and that he realized that by resigning he could not be reinstated as a member of the State Police. This letter was personally signed by plaintiff. Tr. p. 57; P. Ex. 9.

83. Plaintiff had talked of resigning on numerous occasions prior to his meetings with the Commissioner and the Deputy Commissioner in late April and early May of 1973. Tr. pp. 104, 112, 128, 181–83, 295, 300.

84. At no time between the time plaintiff resigned on May 9, 1973, and the time the complaint was filed in May 1975 did he inform any of the defendants in this case that he thought that his resignation had been coerced. Tr. p. 58.

85. Plaintiff's resignation on May 9, 1973, was voluntary and not coerced.

III. *DISCUSSION*

In his complaint, plaintiff alleges that he was repeatedly requested by his superiors to give testimony that would implicate Urello,

Luchansky, Guyette, and Kardash in the wiretap incident at the George Washington Motor Lodge in November 1972; that because he invoked his privilege under the Fifth Amendment and refused to testify before the court-martial of Luchansky, Guyette, and Kardash, he was indefinitely suspended and ultimately received a six week suspension without pay as well as an inter-troop transfer; that at the time he was temporarily suspended, no notice of the charges were given to him nor proper procedures followed; that he was never advised of the findings of the disciplinary board initiated to investigate his conduct; and that although he personally tendered his resignation in what appeared to be a voluntary manner, he was coerced to submit his resignation. Plaintiff further alleges that, as a result of defendant's actions, several of his constitutional and civil rights, which are listed in detail in Section I, have been violated. Plaintiff therefore requests that this court order the Pennsylvania State Police to reinstate him to his former position as Trooper with full back pay at 6% interest, to issue a declaratory judgment finding that defendants have violated his constitutional and civil rights, order defendants to pay punitive damages, and award him costs and reasonable attorney's fees.

### 1. *Fifth Amendment Claim*

Plaintiff claims that although he was permitted to invoke his Fifth Amendment privilege, on advice of counsel, at the court-martial proceedings of Luchansky, Guyette, and Kardash, his subsequent six week suspension and inter-troop transfer were punitive actions taken against him solely because he exercised his Fifth Amendment privilege. He claims such action has a chilling effect on the use of the Fifth Amendment and that a public employee may not be suspended or dismissed solely for exercising his Fifth Amendment privilege, citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Uniformed Sanitation Men Assn. v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), and *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913 (1968).

Plaintiff's interpretation of these cases is in error. It is clear that the Fifth Amendment privilege against self-incrimination should have been available to plaintiff in this case since its protection applies equally to civil and criminal proceedings, when testimony might later subject the witness to criminal prosecution. *Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973); *Malloy v. Hogan*, 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964). It is not as wide sweeping, however, as plaintiff would have this court believe. In *Gardner*, the question presented was "whether a policeman who refused to waive the protections which the privilege gave him could be dismissed from office because of that refusal." *Id.*, 392 U.S. at 276, 88 S.Ct. at 1915. The Court found that the plaintiff may not be "dismissed solely for his refusal to waive immunity to which he is entitled *if he is required to testify despite his constitutional privilege.*" *Id.* at 278, 88 S.Ct. at 1916. (emphasis added). The companion case, *Uniformed Sanitation Men Assn., supra,* also involved persons who were "dismissed for invoking *and* refusing to waive their constitutional right against self-incrimination." *Id.* 392 U.S. at 283, 88 S.Ct. at 1919. In *Cunningham, supra,* the court reaffirmed and clarified the rule in *Gardner,* stating

> Public employees *may* constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties *if they have not been required to surrender their constitutional immunity. Lefkowitz, supra,* 431 U.S. at 806, 97 S.Ct. at 2136. (emphasis added).

This case, however, is in sharp contrast to the factual situation in *Gardner, Sanitation Men, Turley,* and *Cunningham.*[5]

Defendant in the instant case was not suspended because he refused to testify *and* waive his immunity from use of that testimony in subsequent criminal prosecutions,

---

5. A further distinction between the instant case and *Gardner* and its progeny is that in the instant case, plaintiff was given a six week suspension and a temporary inter-troop transfer; whereas in the *Gardner* line of cases, the plaintiffs were dismissed permanently.

but solely because he refused to testify. Whereas in *Gardner, Sanitation Men, Turley,* and *Cunningham* the plaintiffs were required to give up the immunity afforded by the Fifth Amendment or risk losing their livelihood, plaintiff here was faced with either testifying, which testimony could not later be used in criminal prosecution against him under *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), or refuse to testify and face the consequences of suspension or dismissal. He was not compelled to waive his Fifth Amendment immunity.

Such an interpretation of the law was supported by Judge Sirica in *Pinkney v. District of Columbia,* 439 F.Supp. 519 (D.D.C.1977), wherein he accurately summarized the situation as follows:

> To be sure, this choice placed plaintiff on the horns of a dilemma and burdened him in the exercise of his fifth amendment right to remain silent. But under *Gardner* and its progeny the choice that plaintiff was faced with simply does not rise to constitutional proportions. *Id.* at 534.

*See also, Uniformed Sanitation Men Assn. v. Commissioner of Sanitation of the City of New York,* 426 F.2d 619 (2nd Cir. 1970), *cert. denied,* 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972). The imposition of this dilemma on public employees is constitutionally permissible because they, unlike an ordinary citizen, are entrusted with the public interest and welfare and therefore the state has a superceding interest in obtaining answers to "questions specifically, directly, and narrowly relating to the performance of [their] official duties." *Gardner, supra,* 392 U.S. at 277–78, 88 S.Ct. at 1916.

The six week suspension and inter-troop transfer that were imposed upon the plaintiff due to his refusal to testify at the court-martial of Luchansky, Guyette, and Kardash did not unconstitutionally infringe upon his Fifth Amendment privilege from self-incrimination.[6]

## 2. *Sixth Amendment Claim*

■ Plaintiff alleges that his suspension was "imposed 'ex parte' without benefit of hearing, confrontation or objective and meaningful appellate review, in violation of plaintiff's rights under the Sixth Amendment." (Plaintiff's post-trial Brief, p. 12). Plaintiff gives *no* case law to support this bold statement.[7] It is clear, however, the Sixth Amendment guarantees are applicable only in "criminal prosecutions," not civil proceedings, *Hullom v. Burrows,* 266 F.2d 547 (7th Cir.), *cert. denied,* 361 U.S. 919, 80 S.Ct. 262, 4 L.Ed.2d 187 (1959), and that every proceeding that results "in loss of liberty does not *ipso facto* mean that the proceeding is a 'criminal prosecution' for purposes of the Sixth Amendment." *Middendorf v. Henry,* 425 U.S. 25, 37, 96 S.Ct. 1281, 1288, 47 L.Ed.2d 556 (1976).

Plaintiff has given no facts that would justify classifying the suspension as a "criminal prosecution". Accordingly, plaintiff's Sixth Amendment claims will be denied.

## 3. *Due Process Claims*

■ Plaintiff contends that he was denied due process of the law by several actions taken by all or some of the defendants. Although the limits of the due process clause have not yet been, and may be incapable of being, defined, it is generally agreed that due process requires as its *sine qua non* a property or liberty interest. In *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), the United States Supreme Court held

---

**6.** The reason(s) for the imposition of the six week suspension and inter-troop transfer of plaintiff are in dispute. Plaintiff contends that the sole reason for the suspension and transfer was the exercise of his Fifth Amendment privilege. Defendants contend that, as per the Disciplinary Action Report dated May 9, 1973, plaintiff was suspended and transferred not only for invoking his Fifth Amendment rights but also for violating sections 2.08–C and 2.2Q of the Pennsylvania State Police Field Regulations.

**7.** Plaintiff does cite *Lyman v. Swartley,* 385 F.Supp. 661 (D.C.1974); but that is strictly a due process case and will be addressed in the appropriate section.

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of *liberty* and *property*. When protected interests are implicated, the right to some kind of hearing is paramount. But the range of interests protected by procedural due process is not infinite. (footnote omitted) (emphasis added).

To determine whether due process requirements are applicable, the Court went on to state "we must look not to the 'weight' but to the *nature* of the interest at stake . . to see if the interest is within the Fourteenth Amendment's protection of liberty and property." *Id.* at 571, 92 S.Ct. at 2706 (emphasis in original).

Although no definitive list of liberties protected by the due process clause has been enunciated by the Court, it has been held to include generally all those privileges that have long been recognized "as essential to the orderly pursuit of happiness by free men", *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), as well as those situations when "a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him . . . ". *Roth, supra* 408 U.S. at 573, 92 S.Ct. at 2707. In these instances, notice and an opportunity to be heard are required. *Id.*

The Court in *Roth* also described the types of property interests that compel due process protection, stating that

Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Id.* at 577, 92 S.Ct. at 2709.

If plaintiff is to prevail in his due process claims then, it will be incumbent upon him to show that some liberty or property interest protected by the Fourteenth Amendment was violated.

■ The first occasion wherein defendants allegedly denied plaintiff due process was at the interview of the plaintiff by Sgt. Hussack and Lt. Shuck on January 31, 1973. Plaintiff alleges that the three hour off-the-record interrogation by Hussack and Shuck did not comply with § 3.02(A) of the Pennsylvania State Police Field Regulations. That section states

A. Rights of an *Accused* Member: A member who is *accused* of a violation of any Departmental rule or regulation for which he may be Court-Martialed, or if he is *accused* of violating any law, shall be fully informed of the nature of the accusation and the name of the person making the accusation. If he is to be questioned in regard to any such accusation he shall be accorded the same constitutional rights accorded to any citizen as defined by applicable court ruling.

1. A member being questioned must be given the name and rank, or title, of everyone present during the questioning.

2. The entire interrogation shall be recorded verbatim by a competent stenographer furnished by the Department. "Off-The-Record" conversation, the use of threats, offensive language, or promises of reward, are strictly prohibited. (emphasis added).

It is clearly stated that those procedures apply only to members of the Pennsylvania

State Police who are *accused* of violations of rules or regulations for which they may be court-martialed or for violating any law. Since at the time of the interrogation, and for nearly two months thereafter, no accusations were made concerning the plaintiff, he cannot successfully claim denial of due process to property interests that had not yet arisen.[8]

■ Plaintiff also argues that the interrogation was constitutionally infirm because he was not given *Miranda* warnings. *Miranda* warnings are required only when a custodial interrogation is made, not general investigative questioning. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The requirement to *inform* an individual of his right to counsel and his right to remain silent arise only if there is a custodial questioning in regard to a criminal proceeding, and police officers who are the subject of a civil investigation and are not in custody need not be so advised. *Boulware v. Battaglia*, 344 F.Supp. 889 (D.Del. 1972), *aff'd*, 478 F.2d 1398 (3rd Cir. 1973). Going even further, the Court in *Boulware* held that

> [E]ven assuming that the plaintiffs were "in custody" so that informing them of the *Miranda* warnings was a prerequisite to the admissibility of any statement made during the interrogation, there is a further flaw in the plaintiffs' effort to utilize the *Miranda* doctrine in an attempt to recover civil damages. This defect arises from what this Court considers is an erroneous reliance on the primary function and concern of *Miranda*, and the procedural safeguards adopted therein. The plaintiffs seek to predicate civil liability upon the defendants' failure to advise them of their constitutional rights regardless of their knowledge or awareness of the existence and scope of these rights. To insure that custodial interrogation occurred in non-coercive circumstances and that individuals so questioned were apprised of their constitutional rights, *Miranda* established procedural safeguards. Appropriate warnings prior to custodial questioning are prerequisite to admission of any statements made therein regardless of the knowledge or experience of the individual being questioned. However, while *Miranda* prescribed a particular procedural plan, the continued constitutional concern of the Court was the nature of the statements elicited during custodial interrogation and the knowledge of the person subject thereto. The procedure adopted was applicable to all cases presumably to standardize police practice and eliminate judicial hearings on an individual's legal understandings. This Court, however, cannot accept the contention that the *Miranda* rationale supports the proposition that the failure to advise an individual of his constitutional rights creates civil liability when he is already aware of those rights. *Id.* at 902–3.

Plaintiff was an experienced policeman with over twenty-two years of service and had participated in countless investigations subsequent to the *Miranda* decision in 1966. It stretches the credulity of this court to the breaking point to assert that plaintiff was not aware of these rights, particularly in light of the fact that plaintiff was advised at the outset of the interview by Shuck that "if at any time you feel an answer would incriminate you, advise us before you answer that question." (D. Ex. 1). At no time during the course of the interview did plaintiff indicate he felt an answer would be incriminating.

Accordingly, the court does not find that the questioning of plaintiff by Shuck and Hussack violated plaintiff's right to be informed of his right to counsel and to remain silent.

■ The next event wherein plaintiff alleges he was denied due process by some or all of the defendants was the indefinite suspension from duty on March 27, 1973. Plaintiff contends that *Lyman v. Swartley*, 385 F.Supp. 661 (D.Idaho 1974), stands for the proposition that in order to protect a

---

8. Since plaintiff is not an accused and § 3.02(A) of the field regulations is not applicable to the January 31, 1973 interrogation, the court need not address whether or not that section was constitutionally infirm.

public employee's *right to public employment*, due process dictates a specification of the conduct requiring dismissal, an opportunity to respond, and a fair and impartial hearing. Plaintiff either overlooks or ignores the blatant factual distinction between *Lyman* and the instant case. In *Lyman*, plaintiff was a tenured college professor. The court held that

> [T]enure as a legal right means a reasonable expectation of continued employment so long as that employment is performed properly. *This* right of public employment is a *property* right and a teacher may not be deprived of *that* right without being afforded due process of law. *Id.* at 665. (emphasis added).

As such, *Lyman* involved a property interest requiring Fourteenth Amendment due process protection.

As pointed out in *Roth, supra*, an individual, to have a property interest justifying the protection of the due process clause, must "have more than a unilateral expectation of [continued public employment]," he must have "a legitimate claim of entitlement to it." *Id.* 408 U.S. at 577, 92 S.Ct. at 2709. Plaintiff has pointed to no contract, regulation, or statute which confers upon him a property right to continued public employment which would invoke the protection of the due process clause.

On the contrary, it is generally held that in the absence of a statutory provision to the contrary, Commonwealth employees, which includes the Pennsylvania State Police, are subject to removal at the pleasure of the appointing power. *Broadwater v. Otto*, 370 Pa. 611, 88 A.2d 878 (1952); *Ruch v. Wilheim*, 352 Pa. 586, 43 A.2d 894 (1945). The legislature did impose due process requirements for dismissal of state policemen, which is embodied in *Pa.Stat.Ann.* Title 71, § 251(b) (Supp.1979–80) stating in pertinent part that

> (1) Before any enlisted member who has not reached mandatory retirement age is *dismissed* or *refused reenlistment* by the commissioner, the commissioner shall furnish such enlisted member with a detailed written statement of the charges upon which his *dismissal or refusal of reenlistment* is based,

together with a written notice, signed by the commissioner or the proper authority, of a time and place where such enlisted member will be given an opportunity to be heard either in person or by counsel, or both, before a Court-Martial Board appointed by the commissioner. (emphasis added.)

As pointed out by the defendants, this statute addresses only dismissals and refusals to reenlist enlisted members; it does not and has not been interpreted to include temporary suspensions from duty. This interpretation finds further support in the fact that FR 3.02(C) of the Pennsylvania State Police Field Regulations provides for a special investigation to be conducted at the request of any member of the police force when he has reason to believe his position on the force is jeopardized. Thus a remedy does exist independent of § 251(a) for an officer temporarily suspended who feels falsely accused or in jeopardy of losing his position on the force. There is no indication in the record that plaintiff availed himself of this alternative.

Accordingly, this court finds no property interest of continued employment on the part of plaintiff, which would invoke the protection of the due process clause, has been violated by the plaintiff's *temporary suspension* without notice or a fair hearing.

Plaintiff also argues that even if the procedures set forth in 71 P.S. § 251(b) were complied with, they are constitutionally infirm due to an improper mixing of prosecutorial and judicial functions of the commissioner. Although the court need not reach this issue, since the statutes are not applicable to temporary suspensions, it feels compelled to point out that this argument was specifically rejected in *Berman v. Commonwealth of Pennsylvania*, 37 Pa.Cmwlth. 559, 391 A.2d 715 (1978).

In what appears to be an allegation that defendant Barger abused his discretion, plaintiff contends that the board of inquiry found no basis for imposition of punishment for plaintiff's interposition of the Fifth Amendment. This conclusion is inaccurate. It is true that the board of

inquiry unanimously found that plaintiff's conduct did not warrant a court-martial proceeding (P. Ex. 6, para. 2), and that the board also found that "no provision of the Disciplinary Code has been expressly violated. Although it might be possible to infer violations of one or more sections . . ." (P. Ex. 6, para. 3). The board of inquiry, however, expressly recommended that plaintiff be suspended because he did

> not conduct himself in such a manner as to reflect most favorably on the Pennsylvania State Police and that he has engaged in a course of conduct tending to bring the Force into disrepute and reflecting discredit upon himself as an individual member of the Pennsylvania State Police.

Therefore, plaintiff's assertion that the board of inquiry found no violation of the Disciplinary Code or the State Police Field Regulations is not correct. That being the case, plaintiff Barger's imposition of a suspension and inter-troop transfer was not an abuse of discretion.[9] Accordingly, no violation of due process was worked upon plaintiff as a result of defendant Barger's imposition of the temporary suspension and the inter-troop transfer.

To recapitulate, plaintiff claims his right to due process was violated by

1. The failure of Shuck and Hussack to abide by § 3.02(A) when questioning plaintiff on January 31, 1973;

2. The omission of *Miranda* warnings at the interview by Shuck and Hussack on January 31, 1973;

3. The lack of compliance with 71 P.S. § 251(b) when plaintiff was temporarily suspended by defendant Barger on March 27, 1973; and

4. The unconstitutional mixing of prosecutorial and judicial functions of the Commissioner in imposing discipline.

For the reasons set forth in the discussion above, plaintiff's claims of violation of due process will be denied.

*4. Coerced Resignation Claim*

As his final allegation, plaintiff asserts that his resignation on May 9, 1973 resulted from coercion placed upon him by the defendants. Although not specifically stated by plaintiff, it is presumed that he believes this allegedly coerced resignation violated his right to due process under the Fourteenth Amendment.

In support of his allegation, plaintiff summarized his version of the factual scenario, stating

> [P]laintiff was subjected not only to official procedures which violated his constitutional rights, but also to psychological pressure which included threats and harassment directed to the plaintiff by the two highest ranking officers in the Pennsylvania State Police. Tracing the defendants' conduct, a pattern of fundamental unfairness emerges. Plaintiff was subjected to an intense and constitutionally and procedurally infirm interrogation on January 31, 1973. Plaintiff was suspended indefinitely for invoking his Fifth Amendment rights, receiving no opportunity to answer the charges upon which the suspension was based. Plaintiff was threatened by the Commissioner with criminal charges. Plaintiff was threatened with the innuendo that plaintiff's twenty-three year career as a State Policeman was "going down the drain". The plaintiff was ordered by the Commissioner to implicate himself and others in a supposed conspiracy of which the plaintiff knew nothing. Finally, the plaintiff was presented with a Disciplinary Action Report, an appeal from which was a cynical mockery of due process. In light of the foregoing, it is respectfully submitted that the plaintiff's resignation was, in fact, coerced. (P. Brief, pp. 20, 21.)

Defendants, on the other hand, deny that plaintiff's resignation was coerced, alleging that plaintiff had discussed resigning on various occasions with six different officers,

---

**9.** Plaintiff also contends the degree of discipline imposed by defendant Barger was not in compliance with the Commissioner's Special Order dated October 17, 1972. A review of the types of discipline described in the October 17th order reveals that the type of conduct with which plaintiff was charged could support the discipline imposed. (P. Ex. 11, Special Order 72–127, para. 3).

namely, Barger, Shuck, Hussack, Wellendorf, Titler, and Malone, and that plaintiff did not allege his resignation was coerced until some two years after it had been submitted.

During the trial, defendant Barger (Tr. p. 205), defendant Wellendorf (Tr. p. 270), Shuck (Tr. p. 104), Titler (Tr. pp. 182–83), and Malone (Tr. p. 150) testified under oath that plaintiff indicated at various times he was contemplating whether or not he should resign from the force. All of these men testified that in some manner each had attempted to persuade plaintiff not to resign, apparently to no avail. It is only natural that plaintiff would have experienced psychological pressure during the course of events between November 1972 and May 1973 and it is entirely possible that this pressure contributed to or caused the plaintiff to resign on May 9, 1973. But these facts alone are not sufficient to classify plaintiff's resignation as an "unconstitutionally coerced resignation" or a "constructive discharge" such that it would constitute a violation of due process; particularly in light of the fact that any psychological pressure, although very real, was apparently self-induced and not intentionally or even negligently caused by defendants.

The court, in its fact finding capacity, concluded that the resignation of the plaintiff, although executed while plaintiff was under considerable stress, was not coerced by defendant so as to make the resignation a "constructive discharge" in violation of plaintiff's right to due process.[10]

### 5. Claims Under 42 U.S.C. § 1983

■ Plaintiff alleges that one or more acts of defendants constitute a deprivation of his civil rights and therefore violate 42 U.S.C. § 1983. It is true that the interests included within the meaning of "property" and "liberty" as used in the due process clause of the Fourteenth Amendment are protected by § 1983. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, *reh. denied*, 425 U.S. 985, 96 S.Ct. 2194, 48

L.Ed.2d 811 (1976). Based on plaintiff's claims that have been discussed thus far, however, there has been no deprivation of a "liberty" or "property" interest that warrants due process protection. The area for which § 1983 provides redress is not, however, restricted to those rights or interests that warrant due process protection, but includes all civil rights that are created or insured by the United States Constitution and all federal laws. *Paul v. Davis, supra; Holt v. Indiana Mfg. Co.*, 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374 (1900). Rights arising from the state or local governments, however, are not protected by § 1983. *Egan v. Aurora*, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961).

Plaintiff alleges that in addition to the denial of due process, his Fifth Amendment right to remain silent and his Sixth Amendment right to confrontation have been violated. In previous sections of this opinion, the court concluded that these allegations were not well founded and that no violations of plaintiff's Fifth and Sixth Amendment rights were perpetrated by the defendants.

Plaintiff has failed to establish that he has been deprived of "any rights, privileges, or immunities secured by the Constitution and laws." It follows, therefore, that plaintiff's claims under § 1983 must be denied.

### 6. Claims Under 42 U.S.C. § 1985(3)

■ Finally, plaintiff alleges that some or all of the defendants have conspired to deprive him of equal protection of the laws and equal privileges and immunities under the laws, in violation of 42 U.S.C. § 1985(3). In light of the court's finding that plaintiff was deprived of no civil rights, immunities or privileges, there can be no violation of § 1985(3). The pertinent part of § 1985(3) requires

in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in

---

10. Assuming, *arguendo*, that plaintiff's discharge had been coerced by defendants, it does not automatically follow that plaintiff's right to due process would have been violated in light of the court's holding that plaintiff had no "liberty" or "property" right to be protected by due process.

the furtherance of the object of such conspiracy, *whereby another is injured in his person or property*, or deprived of having and exercising any right or privilege of a citizen of the United States . . .

Since any injury that plaintiff may have suffered did not result from the *deprivation of rights* secured by the Constitution or federal statutes, there is no violation of § 1985(3). *Santiago v. City of Philadelphia*, 435 F.Supp. 136 (E.D.Pa.1977). Accordingly, plaintiff's § 1985(3) claims will be denied.

## IV. *CONCLUSIONS OF LAW*

1. Plaintiff did not have a sufficient liberty or property interest in his employment so as to entitle him to procedural due proces before being disciplined.

2. The procedure followed in disciplining plaintiff did not involve an impermissible commingling of prosecutorial and adjudicative functions in violation of due process.

3. The procedure followed in disciplining plaintiff did not violate any Sixth Amendment right to notice and confrontation.

4. Plaintiff was not effectively denied his right against self-incrimination guaranteed by the Fifth Amendment.

5. Plaintiff was not unconstitutionally coerced into resigning from the Pennsylvania State Police.

6. Defendants did not deprive plaintiff of any rights guaranteed by 42 U.S.C. §§ 1983 or 1985(3).