[No. B072479. Second Dist., Div. Four. June 22, 1994.]

TRW, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JACK MA, Real Party in Interest.

COUNSEL

Munger, Tolles & Olson, Terry E. Sanchez and Gary D. Roberts for Petitioner.

No appearance for Respondent.

Allan F. Grossman, Horvitz & Levy, George P. Schiavelli and Ellis J. Horvitz for Real Party in Interest.

## OPINION

**VOGEL (C. S.), J.**—TRW, Inc., petitioned this court for a writ of mandate seeking relief from the trial court's orders that TRW was a government actor when it requested an interview of an employee regarding an alleged violation of security regulations and that an employee has a Fifth Amendment right to counsel at any such interview. The trial court's rulings were in response to motions *in limine* of the real party in interest, Jack Ma, who filed this action for tortious termination. The trial has been stayed by agreement of the parties and pending review of this matter.

### FACTUAL BACKGROUND

#### *TRW's Security System*

TRW is a privately owned company and a defense contractor producing goods and services for the United States Government. Some government contracts involve classified information and require TRW to sign a separate contract with the Defense Investigative Service (DIS), an administrative agency within the Department of Defense. The contract with DIS obligates TRW to safeguard classified information and to maintain a security system in accordance with the DIS's Industrial Security Manual (ISM). The ISM provides that TRW report information coming to its attention of any of its employees who have been cleared for access to classified information indicating such access may not be clearly consistent with the national interest.

To fulfill its obligations according to the ISM, TRW is required to establish procedures to allow employees to report the loss, compromise, or suspected compromise of classified information to TRW's Facility Security Officer (FSO).[1] If a suspected compromise is reported, TRW is required to report it to the Defense Industrial Security Clearance Office (DISCO) and must initiate a preliminary inquiry to ascertain the circumstances surrounding the suspected compromise. If the preliminary inquiry confirms that a suspected compromise of classified information occurred, then TRW is required to make a report of the incident to the Cognizant Security Office

---

[1]The FSO is appointed by TRW to supervise and direct security measures according to United States Government standards for classified material.

(CSO)[2] and the FBI and undertake a complete investigation unless directed not to do so by the CSO.

The procedures for implementing reporting preliminary inquiries and investigations for any suspected breaches of security are established by TRW, subject only to periodic audits by DIS to verify their effectiveness.[3]

---

[2]The CSO is the Office of the Director of Industrial Security for DIS for the appropriate geographical area for the facility.

[3]The ISM provides in relevant part:

"6. *Reports*.

"a. The contractor shall immediately submit in writing to the CSO a report of any of the following.

"(1) *Espionage, Sabotage, or Subversive Activities*. The contractor shall submit an information copy of any report filed under paragraph 6c with the FBI.

"(2) *Loss, Compromise, or Suspected Compromise*. The contractor shall submit a report, classified, if appropriate, of any loss, compromise (including deliberate compromise), or suspected compromise of classified information.

"(3) *Other Security Violations*. The contractor shall submit a report, in addition to the requirement of paragraph (2) above, classified, if appropriate, of each violation of the requirements of this manual involving TOP SECRET or special access information, RESTRICTED DATA, or COMSEC information, regardless of classification, which the contractor possesses in connection with UA contracts or programs.

". . . . . . . . . . . . . . . . . . . . . . .

"b. For all cleared personnel, the contractor shall submit the following reports immediately to the DISCO, Columbus, Ohio 43216, unless the individual involved is or was required to be cleared in connection with the FCL pursuant to paragraph 22, in which case the report will be submitted to the CSO.

"(1) *Adverse Information*. Contractors shall submit reports, classified, if appropriate, of any information coming to their attention concerning any of their employees who have been cleared or who are in the process of being cleared for access to classified information, which indicate that such access or determination may not be clearly consistent with the national interest. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"7. *Loss, Compromise, or Suspected Compromise of Classified Information*.

"a. The contractor shall establish a procedure to ensure that each loss, compromise, or suspected compromise of classified information and each failure to comply with a requirement of this manual is immediately reported to the FSO. . . .

"b. The contractor shall establish such procedures as are necessary to ensure that any employee discovering the loss, compromise, or suspected compromise of classified information outside a facility promptly reports such a fact to:

"(1) the nearest office of the FBI, and furnishes sufficient information to assist in identification of the information—if the loss, compromise, or suspected compromise occurs outside the U.S., the nearest U.S. authorities shall be notified in lieu of the FBI; and

"(2) the FSO, by the fastest means of communication, who will then comply with paragraph c below.

"c. Immediately on receipt of a report, in accordance with paragraphs a or b above, the contractor shall initiate a preliminary inquiry to ascertain all of the circumstances surrounding

Compliance with the established procedures is administered and executed entirely by TRW employees. Members of TRW's security department do not make arrests, carry weapons, or wear uniforms or law enforcement badges, and the ISM does not require or authorize them to do so. There is no participation by government agents in TRW's preliminary inquiries pertaining to a suspected compromise of security. Other factual references to TRW's security program will be provided in the analysis of the issues that follow.

### Preliminary Inquiry About Ma

The real party in interest, Jack Ma, was hired as a physicist by TRW in January of 1985. He obtained the necessary security clearance and was assigned to the Electromagnetic Survivability and Vulnerability Department (ESV) involving the protection from nuclear attack. Ma was initially assigned to a section under the supervision of Dr. Tim Rynne. In June of 1985, over his objection, Ma was reassigned to another section supervised by Dr. Mike Schmidt.

In November 1985, the head of the ESV, Charles S. Wuller, was contacted by TRW employee George Hoffman who expressed concerns that Ma may have violated security regulations and exhibited bizarre behavior. The following day, Hoffman sent Wuller a followup memorandum reporting that Ma had made telephone contacts with foreign nationals and had been heard using the terms and phrases " 'warheads,' " " 'silo penetration,' " " 'space weaponry,' " and " 'TRW is working on . . . .' " Hoffman's report also states that Ma informed another TRW employee he "is 'working on a system that would cause hostile missiles to turn around and return to the point of launch and explode,' " and that Ma is program manager of 100 to 1000 persons on a project to analyze "trajectory reversal." The memorandum attributes to Ma the claim that he traveled to Europe to meet with "non-US" nationals to discuss quantum gravity reversal and is a sales agent shipping computer hardware to Europe. Hoffman had expressed his concerns about Ma to section heads Schmidt and Rynne in mid-July, several months before contacting Wuller.

---

the reported loss, compromise, suspected compromise, or failure to comply with a requirement of this manual. In the event of loss, a thorough search shall be conducted for the classified material.

"d. If the contractor's inquiry prescribed in paragraph c above confirms: (i) that a loss, compromise, or suspected compromise of any classified information occurred . . . , the contractor immediately shall submit a report of the incident to the CSO in accordance with paragraph 6a(2) or 6a(3), as appropriate, and conduct a complete investigation of the incident unless otherwise notified by the CSO. Submission of the report shall not be deferred pending completion of the contractor's investigation." (Fns. omitted.)

Wuller regarded Hoffman's report about Ma as an indication of "[an] alleged security violation[ ] and . . . bizarre behavior." He consulted with the director of personnel, Karen D. Wolff. Wuller was not satisfied that Ma had committed any violation of security since the terms and phrases attributed to him appeared in newspapers and magazines. He was more concerned about Ma's failure to report his purported contacts with foreign nationals. Although he thought the incident was "sort of a red flag," he did not believe Ma had committed any crime and did not report the incident to any law enforcement agencies. However, Wuller sent Hoffman's memorandum to TRW's security department asking for an investigation and determination if any action should be taken with regard to Ma's clearance and access to secret material.

Wuller summoned Ma to his office and met with him, Schmidt, and Wolff. Wuller inquired if Ma was ill or having any personal problems and carried on a brief conversation about quantum gravity. Wuller asked Ma to see Valerie Miller, a TRW nurse. Wuller never told Ma anything regarding his alleged violation of security regulations.

When Ma met with Miller, he thought she was an ombudsman and did not realize she was in TRW's medical department. She indicated she was aware of some controversy between Ma and Schmidt and asked for information about it. Ma told her Schmidt was stonewalling him on Ma's request for classified materials.

Miller informed Ma an appointment had been made for him to see a TRW psychiatrist, Dr. Purchard, that afternoon and to not report to work on the following Monday. Ma doubted Miller's directions and telephoned Wuller, who told Ma to see Dr. Purchard that evening and they would contact him about returning to work after they received the psychiatrist report.

Ma was disturbed about the way he was treated. He did not know Miller was a nurse when he was referred to her and was unaware that anyone scheduled an appointment for him to see a psychiatrist. He was apprehensive about the suggestion that he was mentally ill and he was concerned he might end up in a mental institution. He thought it was "probably a trump up" and cancelled his appointment with Dr. Purchard and considered hiring a lawyer.

On Monday, he went to TRW to see Dr. Plebuch, the head of the laboratory and Wuller's boss. A meeting with Plebuch took place with Wuller and Wolff in attendance. Ma informed Plebuch about his difficulties at work and the direction to see a psychiatrist before returning to work. Dr. Plebuch told Ma to not return to work until he was contacted. On Wednesday, Ma received a certified letter from TRW advising him that "management" referred him to Dr. Purchard for an evaluation and "suggest[ed]" he

schedule an appointment by the following Friday. The letter further advised him, until the medical report is "evaluated, you should not report for work." Instead of following TRW's suggestion, Ma engaged a lawyer, Dennis A. Devermont.

Devermont contacted TRW and arranged a meeting among Ma, Devermont, and TRW's lawyer, Inese B. Lacey. Lacey opened the meeting by mentioning that she had heard about Ma's controversy with his supervisor. Ma essentially repeated what he had told Miller about his relationship with Schmidt and the difficulty he had obtaining access to documents. She inquired if Ma had filed a complaint with the grievance committee. Ma responded "no" and that he did not even know of any such committee. The meeting lasted three hours, but, again, no mention was made of any concern about a violation of TRW's security regulations.

Following the meeting with Lacey, Ma received a telephone call from Earl Nishimura of TRW's security department asking Ma to attend an interview. Nishimura told Ma that he had "sort of an obligation to come in and speak to us regarding foreign contacts" but "this was not a criminal investigation." Ma told Nishimura he had a lawyer who was handling the matter "[and] you are not supposed to talk to me, and you should talk to my lawyer." Nishimura telephoned Devermont and told him he wanted to interview Ma regarding an "investigation into the allegation for the violation of the company rules, regulations, and procedures and that there was no criminal investigation involved and that an attorney was not necessary." Devermont advised Nishimura Ma would attend an interview accompanied by his counsel, but not otherwise, and later confirmed Ma's position in a letter to TRW's lawyer: "Jack Ma and myself would be more than happy to attend a meeting where Mr. Ma could be questioned about security violations." TRW viewed the requested interview as an internal investigation of Ma's failure to report alleged contacts with foreign nationals and Ma's failure to attend as a lack of cooperation, contrary to a condition of his employment.

On December 13, 1985, TRW's personnel manager sent Ma a letter about his failure to meet with the security department on December 12 to "answer questions regarding alleged security violations committed by you." The letter directed Ma to contact Nishimura for an appointment no later than December 20 and informed him that he had been suspended without pay. When Ma did not attend on December 12, Nishimura contacted an FBI agent and informed him of the allegations about Ma's contacts with foreign nationals and his failure to attend an interview. Nishimura stated his reason for doing this was to protect himself and not because he believed any crime had been committed.

*Suspension and Termination of Ma*

When Ma had not contacted Nishimura to arrange an interview by December 20, 1985, TRW sent DISCO a report pursuant to ISM paragraph 6b(1) advising TRW had received information that Ma had made contact with foreign nationals. The report informed DISCO that TRW began an investigation which revealed that Ma informed coworkers of "such encounters and has been heard to use phrases and wording vernacular such as ' "silo penetration," ' ' "war heads," and "space weaponry." ' " The letter further reported that Ma refused to appear for a requested interview and that he was suspended.

In March 1986, Ma was contacted by DIS and requested to attend an interview regarding alleged security violations. He did not contact his lawyer about the interview and met with an agent of the Department of Defense unaccompanied by counsel. Ma was aware the interview covered the same subject matter Nishimura of TRW wanted to discuss when he asked for a meeting. Ma explained that he met the government agent because the agent was not paid by TRW and because he told the agent he would contact his lawyer if he felt the interview was not being fairly conducted. The agent prepared a statement of the information Ma gave him. Ma reviewed, corrected, and signed it without the presence or advice of his lawyer.

In December 1987, Ma's suspension became permanent and he was terminated for insubordination. Ma commenced the present action against TRW. On March 19, 1991, Ma filed his second amended complaint alleging tortious termination based on public policy, breach of the implied covenant of good faith and fair dealing, and malicious prosecution. TRW filed its answer denying Ma's allegations and asserted numerous affirmative defenses on July 23, 1991.

## PROCEDURAL BACKGROUND

Both TRW and Ma filed motions *in limine* addressing the admission or exclusion of evidence and for the determination of the following issues of law: (1) was TRW acting as a government agent; (2) did Ma have a Fifth Amendment right to the representation of counsel at the interview requested by TRW's security department; and (3) did Ma's termination violate a firmly established public policy under *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].

On December 29, 1992, the trial court filed its statement of decision holding (1) as a matter of law, TRW " 'was a government actor in ordering

[Ma] to attend the proposed security interrogation' "; (2) there is an established public policy that on or before November 1985, a person ordered to attend a security interrogation to be conducted in custodial setting which has focused upon him as a criminal suspect and has reached the accusatory stage is entitled to an attorney and the denial thereof is a violation of his federal and California constitutional rights and privileges against self-incrimination; (3) "[a]t the time of the proposed security interrogation, the investigation had focused upon [Ma] as a criminal suspect and had, therefore, reached the accusatory stage"; (4) "[t]he interrogation to which [Ma] was ordered to go upon penalty of losing his job was custodial."[4]

TRW filed a petition for writ of mandate in this court alleging it had no plain, speedy, or adequate remedy at law because it could not otherwise avoid a costly, protracted, and perhaps unnecessary trial and appeal and retrial based on its position that the trial court's orders are erroneous and would result in fundamental instructional error. TRW further contended that the trial court's orders threatened to place the entire defense industry into a state of great uncertainty impairing its members' ability to conduct business and safeguard classified information. We denied the petition and TRW petitioned for review in the Supreme Court, and the matter was retransferred to us with directions to issue an alternative writ. (Code Civ. Proc., § 1087.)[5]

## CONTENTIONS

Ma's tort cause of action alleges that his termination was in violation of public policy. (*Tameny* v. *Atlantic Richfield Co., supra*, 27 Cal.3d 167, 177.) The public policy which he claims was violated is the privilege against self-incrimination in the Fifth Amendment of the United States Constitution, as implemented by the right to the presence of an attorney at a custodial interrogation under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Ma contends that although the Fifth Amendment ordinarily applies only to governmental action, TRW was a "federal government actor" in the circumstances of this case, subject to the constraints of the Constitution. He contends that the proposed internal

---

[4]The trial court's orders that TRW was a government actor and that an individual has a constitutional right to counsel at a security "interrogation" were made as a matter of law. The orders that Ma was a criminal suspect and that an accusatory stage had been reached and that the proposed "interrogation" was custodial were in the nature of findings based on "oral and documentary" evidence and would be binding on the jury.

[5]An order of the Supreme Court directing an alternative writ be issued is a determination that the petitioner is without an adequate remedy and nothing more. It is not an indication that the Supreme Court has found that the petitioner is correct on the merits. (*Bridgestone/ Firestone, Inc.* v. *Superior Court* (1992) 7 Cal.App.4th 1384, 1389, fn. 4 [9 Cal.Rptr.2d 709].)

security interview "would have been" the type at which he had a constitutional right to the presence of an attorney to implement his privilege against self-incrimination. Therefore, he contends, TRW's termination of his employment because he refused to attend the interview without an attorney violated an established public policy under the Fifth Amendment of the United States Constitution. In its rulings on the motions *in limine*, the trial court agreed with Ma on each of these issues, as a matter of law.

We conclude to the contrary, and direct the trial court to vacate its orders. The conduct of TRW, a private person, was not rendered governmental conduct by TRW's contract with the United States. Furthermore, even if TRW were treated like a governmental employer, the proposed interview did not involve custodial interrogation which would have invoked the *Miranda* right to the presence of an attorney, nor was Ma's termination an unlawful punishment for asserting the privilege against self-incrimination. TRW's conduct did not violate an established public policy.

### DISCUSSION

### *Governmental Actor*

The public policy asserted as the basis for Ma's cause of action for wrongful termination in violation of public policy is the Fifth Amendment of the United States Constitution. TRW is a private corporation. Ordinarily, the rights in the Fifth Amendment are secured against intrusions only by the government, not by private persons. (*Flagg Bros., Inc.* v. *Brooks* (1978) 436 U.S. 149, 156 [56 L.Ed.2d 185, 193, 98 S.Ct. 1729].) The trial court nevertheless found that TRW's refusal to allow Ma to bring his attorney to the proposed security interview was subject to constitutional constraint on the ground that TRW was in this respect a "federal government actor." The court based its order on the following theories: (1) TRW was performing a public function, i.e., nuclear weaponry and national defense, (2) TRW was required by the ISM to make inquiry into Ma's suspected compromise of security, and (3) TRW and the Department of Defense were in a "symbiotic relationship," "close nexus," or "joint venture" regarding protection of national military secrets and detection of violations.

Ma relies primarily on *Burton* v. *Wilmington Pkg. Auth.* (1961) 365 U.S. 715 [6 L.Ed.2d 45, 81 S.Ct. 856], where a privately owned restaurant which engaged in racial discrimination was an integral part of a state-owned public parking facility which depended upon rental income from the restaurant to service the public debt incurred to build the facility. The court held a patron denied service at the restaurant could obtain injunctive relief, despite the

claim the restaurant owner's conduct was purely private, because under the particular circumstances of the lease "[t]he State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity." (*Id.* at p. 725 [6 L.Ed.2d at p. 52].) Ma notes that in *Holodnak* v. *Avco Corp., Avco-Lycoming Div., Stratford* (2d Cir. 1975) 514 F.2d 285, 287, 289, *Burton* was applied to a defense contractor who operated a plant on land owned by the United States, with equipment owned by the United States, subject to close supervision by federal employees on the premises. Under those circumstances, the court held the private contractor must observe the First Amendment free speech rights of the contractor's employee.

In the years since *Burton*, the United States Supreme Court has tended to limit *Burton*[6] and to focus more narrowly on the involvement of the government in the particular decision about which a plaintiff complains. (*Jackson* v. *Metropolitan Edison Co.* (1974) 419 U.S. 345, 351, 358 [42 L.Ed.2d 477, 484, 488, 95 S.Ct. 449] [fact that private utility is subject to heavy regulation is not sufficient to convert its action to state action; describes *Burton*'s holding as limited to lessees of public property]; *Lugar* v. *Edmondson Oil Co.* (1982) 457 U.S. 922, 937-938 & fn. 19 [73 L.Ed.2d 482, 495-496, 102 S.Ct. 2744] [official involvement in seizure of debtor's property].) In *Lugar*, the court said, "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." (457 U.S. at p. 937 [73 L.Ed.2d at p. 495].)

In two cases decided contemporaneously with *Lugar*, the court found insufficient governmental coercion, encouragement, or involvement with the particular decisions of private actors. One of these, as here, was an employment termination case. In *Rendell-Baker* v. *Kohn* (1982) 457 U.S. 830 [73 L.Ed.2d 418, 102 S.Ct. 2764], a vocational counselor was fired from a position in a private nonprofit school, to which maladjusted students were referred by public school districts pursuant to state law. The school was heavily regulated and received almost all its funds from public sources. The plaintiff alleged she was discharged from employment without due process because she exercised First Amendment rights. The court found no state

---

[6]Further, the court in *United States* v. *Solomon* (2d Cir. 1975) 509 F.2d 863, 871, commented that even in a *Burton*-type lease, "It is one thing to say that the exclusion of blacks is no more permissible for a restaurant which is a lessee of a state parking authority than it would be for the authority itself; it would be altogether different to say that a lease of state property carries the privilege against self-incrimination on its back . . . if the proprietor of the Eagle Coffee Shoppe had interrogated a waiter suspected of snatching a patron's purse."

action in the decision to terminate the employee. The court first noted that "The school . . . is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." (*Id.* at pp. 840-841 [73 L.Ed.2d at p. 427].) The court held, "Here the decisions to discharge the petitioners were not compelled or even influenced by any state regulation. . . . The most intrusive personnel regulation promulgated by the various government agencies was the requirement that the Committee on Criminal Justice had the power to approve persons hired as vocational counselors. Such a regulation is not sufficient to make a decision to discharge, made by private management, state action." (*Id.* at pp. 841-842 [73 L.Ed.2d at p. 428].)

The court drew a similar distinction in *Blum* v. *Yaretsky* (1982) 457 U.S. 991 [73 L.Ed.2d 534, 102 S.Ct. 2777]. There Medicaid patients in nursing homes challenged on due process grounds a decision to transfer them to a lower level of care. The transfer decisions were made by a review committee of attending physicians, but the plaintiffs argued state action was involved because government regulations encouraged transfers and because government benefits were reduced upon transfer. The court stated the purpose of the rule that there be a sufficiently close nexus between the state and the challenged action is "that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." (*Id.* at p. 1004 [73 L.Ed.2d at p. 546], italics in original.) Second, the court said, "although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." (*Ibid.*) Construing the statute and regulations, the court rejected the plaintiffs' argument that the government affirmatively commanded the transfers. (*Id.* at pp. 1005-1009 [73 L.Ed.2d at pp. 547-550].) "Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." (*Id.* at p. 1008 & fn. 19 [73 L.Ed.2d at p. 549].)[7]

The court followed *Blum's* reasoning in a later case, *San Francisco Arts & Athletics* v. *U.S.O.C.* (1987) 483 U.S. 522 [97 L.Ed.2d 427, 107 S.Ct. 2971].

---

[7]Unlike *Rendell-Baker* and the instant case, the private parties were not defendants in *Blum*; the plaintiffs sued governmental defendants. Nevertheless, the court found the private party precedents instructive, and cited them interchangeably. (*Blum* v. *Yaretsky*, *supra*, 457 U.S. at pp. 1003-1004 [73 L.Ed.2d at pp. 545-546].) In *Rendell-Baker*, the court relied in turn upon *Blum*. (*Rendell-Baker* v. *Kohn*, *supra*, 457 U.S. at pp. 839-841 [73 L.Ed.2d at pp. 426-428].)

There the United States Olympic Committee, a private corporation created by federal law, exercised its statutory power to restrain the plaintiff from using the word "Olympic" in plaintiff's event. The court found no state action in this conduct so as to give rise to a Fifth Amendment claim. Citing *Blum* and *Rendell-Baker*, the court said, "The USOC's choice of how to enforce its exclusive right to use the word 'Olympic' simply is not a governmental decision. [Fn. omitted.] There is no evidence that the Federal Government coerced or encouraged the USOC in the exercise of its right." (*Id.* at p. 547 & fn. 29 [97 L.Ed.2d at p. 455].)

Applying these precedents here, we conclude TRW's decision not to allow Ma's attorney to attend the interview was a private decision not involving federal government action. The evidence is uncontradicted that government agents did not participate in TRW's internal security interviews of employees. Robert Schwalls, former deputy director of DIS, declared: "DIS does not participate in, coordinate with or direct a contractor's internal security investigations, even if they are conducted by the contractor to aid in its compliance with its reporting obligations under the ISM. Each contractor initiates, coordinates, and directs its own security investigations." Ma points out that the government offered contractors a training course on compliance with the ISM, but the evidence showed this training course included nothing about how to conduct preliminary investigations.

Although paragraph 7(c) of the ISM required TRW to "initiate a preliminary inquiry to ascertain all of the circumstances surrounding the reported loss, compromise, suspected compromise, or failure to comply with a requirement of this manual," the ISM did not specify *how* this preliminary inquiry was to be conducted. The ISM did not even specifically require that an interview of the suspected employee be conducted much less mention the presence of counsel. Despite a myriad of detailed procedures specified in the ISM, Ma points to none which gives any direction concerning the participation of a lawyer.

In the absence of evidence that the government required or encouraged the particular deprivation of which Ma complains, TRW's private conduct was not transformed into governmental action constrained by the Fifth Amendment merely because TRW was contractually obligated to make some inquiry. (*Blum* v. *Yaretsky*, *supra*, 457 U.S. at p. 1004 [73 L.Ed.2d at pp. 546-547]; *Rendell-Baker* v. *Kohn*, *supra*, 457 U.S. at p. 851 [73 L.Ed.2d at p. 434]; *San Francisco Arts & Athletics* v. *U.S.O.C.*, *supra*, 483 U.S. at p. 546 [97 L.Ed.2d at pp. 454-455]; *Pinhas* v. *Summit Health, Ltd.* (9th Cir. 1990) 894 F.2d 1024, 1034 [no state action in revocation of physician's staff privileges by private hospital's peer review committee; although the

peer review procedure was mandated by government, the particular decision to remove the physician was a private decision based on professional judgments].)

This conclusion is consistent with two cases upon which Ma heavily relies, which are distinguishable. Ma points especially to *Becker* v. *Philco Corporation* (4th Cir. 1967) 372 F.2d 771, because that case likewise involved a defense contractor and the ISM. There the court held that in making the report to the government which is required by paragraph 6(b) of the ISM, the contractor was immune from liability for defamation. (372 F.2d at pp. 773-774.) That case is different because the ISM mandatorily required that even mere suspicion be reported to the government. (*Id.* at p. 774.) Here, the ISM required an inquiry, but did not mandate the particular conduct of which Ma complains. Ma also cites *United States* v. *Davis* (9th Cir. 1973) 482 F.2d 893, an airport search case in which the action of a private air carrier was held directed by the federal government, and hence subject to the Fourth Amendment. There, however, the search of a boarding passenger's carry-on luggage was *specifically* mandated by federal regulations. (*Id.* at pp. 901, 902, & fn. 24.) *Davis* was distinguished on this ground in *United States* v. *Gumerlock* (9th Cir. 1979) 590 F.2d 794, 796-797, where an air carrier's search of *freight* was held private conduct not mandated by the government's program for passengers' *carry on* luggage.

Thus, even though TRW's possession of classified information is subject to regulation by TRW's contractual relation with the federal government, TRW's conduct in this case was private, not specifically required or encouraged by the government, and was not subject to the Fifth Amendment. In a slightly different but analogous context of the Federal Tort Claims Act, under which the federal government is liable for the conduct of its employees but not the conduct of contractors, the Supreme Court commented, "Billions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government. These contractors act for and are paid by the United States. They are responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its implementation. . . . Similarly, by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs . . . into federal governmental acts." (*United States* v. *Orleans* (1976) 425 U.S. 807, 815-816 [48 L.Ed.2d 390, 399, 96 S.Ct. 1971], fns. omitted.)

### Ma's Constitutional Claims

We have held that TRW was not a governmental actor and therefore was not subject to the restraint of the Fifth Amendment. We also conclude that,

even if TRW were a governmental actor, TRW's conduct did not violate Ma's Fifth Amendment rights and therefore did not violate established public policy.

*Presence of Attorney*

Ma contends that TRW's refusal to allow Ma to have his attorney present at the security interview violated established public policy. The public policy which Ma claims was violated by this conduct is the rule of *Miranda* v. *Arizona, supra*, 384 U.S. 436, 471 [16 L.Ed.2d 694, 721-722], affording a person subjected to custodial interrogation by law enforcement the right to the presence of an attorney during interrogation, in order to effectuate the privilege against self-incrimination. The parties refer to this right as the Fifth Amendment right to counsel, as distinguished from the Sixth Amendment right to counsel, which does not arise until formal criminal proceedings have commenced.

Ma's argument is erroneous because the Fifth Amendment right to the presence of counsel under *Miranda* arises only if the person subjected to interrogation is in *custody*, which has been defined as the equivalent of formal arrest. Ma's argument that other coercive circumstances can substitute for custody is unsupported by the law. Ma's argument that he was, or would have been, subjected to custodial interrogation is unsupported by the evidence.

The court in *Miranda* explained why a suspect subjected to custodial interrogation must be warned of the right to have an attorney present: "The circumstances surrounding in-custody interrogation [incommunicado interrogation in a police-dominated atmosphere] can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." (384 U.S. at p. 469 [16 L.Ed.2d at pp. 707-721].)

Although a suspect has a Fifth Amendment privilege against self-incrimination even if not in custody, the right to the presence of an attorney to implement that privilege does not arise in the absence of *custodial* interrogation. (*Beckwith* v. *United States* (1976) 425 U.S. 341, 347 [48 L.Ed.2d 1, 8, 96 S.Ct. 1612]; *U.S.* v. *Long* (11th Cir. 1989) 866 F.2d 402, 405; *U.S.* v. *Lennick* (7th Cir. 1990) 917 F.2d 974, 978; *Boulware* v. *Battaglia* (D.Del. 1972) 344 F.Supp. 889, 902.)

"Custody," for the purpose of triggering the Fifth Amendment right to counsel, is formal arrest or the loss of freedom of movement to the same

degree as formal arrest. (*California* v. *Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279-1280, 103 S.Ct. 3517].) Ma's reliance on language in *Miranda* referring to "freedom of action" is misplaced. Ma argues that the phrase, "in custody or otherwise deprived of his freedom of action in any significant way" (384 U.S. at p. 445 [16 L.Ed.2d at p. 707]), means that coercive or intimidating circumstances, such as the potential loss of a job, might in some circumstances substitute for custody and require the presence of counsel to prevent the suspect's will from being overcome. The Supreme Court has repeatedly rejected this interpretation of *Miranda's* language. Subsequent cases make clear that freedom of action refers to freedom of physical movement. In *Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711], the suspect was interrogated at a police station but was not under arrest or restricted from leaving. The court rejected the notion that other coercive factors could substitute for physical custody so as to require *Miranda* warnings. "Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (*Id.* at p. 495 [50 L.Ed.2d at p. 719], italics in original; *California* v. *Beheler, supra,* 463 U.S. at pp. 1123-1125 [77 L.Ed.2d at pp. 1278-1280]; *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 437 [82 L.Ed.2d 317, 332-333, 104 S.Ct. 3138].)

The fear that Ma could lose his job or security clearance, or be subjected to criminal prosecution as a future result of the interrogation, is insufficient to convert a noncustodial interrogation into a custodial one. (See *United States* v. *Bowers* (6th Cir. 1984) 739 F.2d 1050, 1055-1056 [suspect feared disciplinary action against professional license if he refused to talk to investigator].) In *United States* v. *Dockery* (8th Cir. 1984) 736 F.2d 1232, 1234, and *U.S.* v. *Goudreau* (8th Cir. 1988) 854 F.2d 1097, 1098, employees were directed by their employers to interview with FBI agents. This was held not to change the noncustodial character of the FBI interviews. There are other situations where the suspect may perceive heavy pressure to attend an

interrogation, and face unpleasant choices between self-incrimination or other alternatives, but this does not mean the suspect is constitutionally entitled to bring a lawyer to the interrogation. (*United States* v. *Mandujano* (1976) 425 U.S. 564, 581 [48 L.Ed.2d 212, 225, 96 S.Ct. 1768] [no right to presence of an attorney during questioning by grand jury].) In *Minnesota* v. *Murphy* (1984) 465 U.S. 420, 433 [79 L.Ed.2d 409, 423, 104 S.Ct. 1136], a probationer had a legal duty to attend an interview and cooperate with his probation officer, and he was questioned about another crime. The court stated "Even a cursory comparison of custodial interrogation and probation interviews reveals the inaptness of the Minnesota Supreme Court's analogy to *Miranda*. Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. [Citation.] It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression. . . . Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. [Citation.] Since Murphy was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." (*Id.* at p. 433 [79 L.Ed.2d at p. 423], fn. omitted.)

Because Ma refused to attend the interview, he obviously was not subjected to actual custodial interrogation. He must argue that the interrogation "would have been" custodial, and that he was terminated for refusing to attend a custodial interrogation without an attorney present. In its statement of decision, the trial court cited various factors for its conclusion the interrogation would have been custodial. These included that Ma feared he was being accused of violating criminal laws relating to national security, that no one told him he would be free to leave the interrogation at any time or that he need not fear arrest, that TRW's policy is to notify the FBI immediately upon obtaining incriminating evidence, and TRW did in fact notify the FBI immediately after Ma's *failure* to attend the interview.

■ The test whether the circumstances are custodial is an objective one, based on what a reasonable person in the suspect's circumstances would perceive. (*Berkemer* v. *McCarty, supra,* 468 U.S. at p. 442 [82 L.Ed.2d at p. 336]; *Stansbury* v. *California* (1994) 511 U.S. __ [128 L.Ed.2d 293, 299-300, 114 S.Ct. 1526, 1530].) This is a mixed question of law and fact, as to which the appellate court exercises its independent conclusion on the legal question of reasonableness, based on the facts as found by the trial court if supported by substantial evidence. (See *People* v. *Leyba* (1981) 29 Cal.3d 591, 597-598

[174 Cal.Rptr. 867, 629 P.2d 961].) Exercising our judgment, we hold that no reasonable person in Ma's circumstances could reasonably conclude the proposed security interview would be custodial as defined by the law, i.e., that if he attended the interview he would be under arrest and not free to leave the interview.

TRW's letters to Ma sought an appointment for an interview as a "condition of employment," but did not refer to arrest. The uncontradicted evidence showed that TRW's internal security officers have no police powers, do not make arrests, and do not wear uniforms or badges or carry guns. TRW's internal security officers do not detain employees during security interviews; the employees are free to leave the interviews. Interviews are conducted in an open cubicle with five-foot-high soft partition walls, which have an open doorway. Interviews last from less than a minute, if the employee does not wish to be interviewed, to one hour at the most. Government agents do not participate in TRW's internal security interviews. The FBI was contacted only after Ma failed to attend; the FBI was not contacted to have an agent show up for the interview. If during the course of an internal investigation TRW became aware of the potential of criminal charges, TRW would cease its investigation and notify the FBI; TRW had no participation in any subsequent investigation by the FBI.

Ma's contention that a reasonable person in his circumstances would have believed he would not be free to leave the interview is belied by his own admissions and conduct. Ma *admitted* knowing that TRW's security investigators could not arrest him and could only make allegations which if proven true could result in future arrest or imprisonment by law enforcement. Furthermore, Ma was subsequently willing to and did talk to a Department of Defense agent without his lawyer present.

The record thus contains no substantial evidence that the proposed security interview would have been custodial as defined by law, so as to invoke the Fifth Amendment right to the presence of an attorney. There was simply no reasonable basis for Ma to believe the requested interview was custodial interrogation. Therefore, TRW did not violate the fundamental public policy of *Miranda* by refusing to permit Ma's attorney to come with him to the proposed interview.

### Self-incrimination

 Ma contends he "could not constitutionally be compelled to voluntarily respond to TRW's interrogation; he was constitutionally entitled to exercise his Fifth Amendment right to remain silent." He then contends, "the Government has no power to punish an individual for refusing to voluntarily submit to interrogation" and "[t]he loss of his job for asserting [the right to remain silent] violates public policy."

This argument is misconceived. Even if TRW were treated as a governmental employer, a public employer *may* terminate a public employee who refuses to answer questions directly, specifically, and narrowly related to the performance of the employee's duties. (*Gardner* v. *Broderick* (1968) 392 U.S. 273, 278 [20 L.Ed.2d 1082, 1086-1087, 88 S.Ct. 1913]; *Sanitation Men* v. *Sanitation Comm'r.* (1968) 392 U.S. 280, 284 & 285 [20 L.Ed.2d 1089, 1092-1093, 88 S.Ct. 1917] (conc. op. of Harlan, J.); *Lefkowitz* v. *Cunningham* (1977) 431 U.S. 801, 806 [53 L.Ed.2d 1, 7-8, 97 S.Ct. 2132]; *Asherman* v. *Meachum* (2d Cir. 1992) 957 F.2d 978, 982; *Erwin* v. *Price* (11th Cir. 1985) 778 F.2d 668, 670; *Gulden* v. *McCorkle* (5th Cir. 1982) 680 F.2d 1070, 1075; *DeWalt* v. *Barger* (M.D.Pa. 1980) 490 F.Supp. 1262, 1271-1272; *Grabinger* v. *Conlisk* (N.D.Ill. 1970) 320 F.Supp. 1213, 1218; *Pinkney* v. *District of Columbia* (D.D.C. 1977) 439 F.Supp. 519, 534; *Szmaciarz* v. *State Personnel Bd.* (1978) 79 Cal.App.3d 904, 914-919 [145 Cal.Rptr. 396].)

The line of cases cited by Ma from *Garrity* v. *New Jersey* (1967) 385 U.S. 493, 494-497 [17 L.Ed.2d 562, 564-565, 87 S.Ct. 616], to *Lefkowitz* v. *Turley* (1973) 414 U.S. 70, 85 [38 L.Ed.2d 274, 286, 94 S.Ct. 316], stands only for the proposition that the government may not, upon threat of termination, require a public employee to speak *and* to waive the immunity from use in a subsequent criminal prosecution which would ordinarily attach to such a compelled admission. (*Lefkowitz* v. *Cunningham, supra,* 431 U.S. at p. 806 [53 L.Ed.2d at pp. 7-8]; *Baxter* v. *Palmigiano* (1976) 425 U.S. 308, 316-317 [47 L.Ed.2d 810, 820-821, 96 S.Ct. 1551]; *Gulden* v. *McCorkle, supra,* 680 F.2d at p. 1075.)

Summarized another way by our own Supreme Court, these cases show that a public employee has no constitutional right to "remain silent *free of administrative sanction.* As a matter of constitutional law, it is well established that a public employee has no absolute right to refuse to answer potentially incriminating questions posed by his employer. Instead, his self-incrimination rights are deemed adequately protected by precluding any use of his statements at a subsequent criminal proceeding." (*Lybarger* v. *City of Los Angeles* (1985) 40 Cal.3d 822, 827 [221 Cal.Rptr. 529, 710 P.2d 329], italics in original.)

As stated in *Asherman* v. *Meachum, supra,* 957 F.2d at page 982, "The fact that a public employee might face the unpleasant choice of surrendering his silence or losing his job is no bar to an adverse consequence so long as the consequence is imposed for failure to answer a relevant inquiry and not for refusal to give up a constitutional right."

By analogy, Ma's employer, TRW, had the right to question Ma about alleged breaches of security committed by him in the course of his employment. If Ma feared that his answers might tend to incriminate him, he of

course could refuse to discuss the matter with his employer; but he cannot in reason or law expect an employer to retain confidence in an employee who refuses to discuss legitimate employer questions about the employee's job performance. There is no evidence TRW sought a waiver of immunity of the type involved in the *Garrity* line of cases. (*Lefkowitz* v. *Cunningham, supra,* 431 U.S. at p. 806 [53 L.Ed.2d at pp. 7-8].) TRW's termination of Ma for his refusal to respond to legitimate inquiries about his performance was not in these circumstances a punishment for exercising a constitutional right, and therefore was not a termination in violation of public policy.

### Firmly Established Public Policy

TRW alternatively argues that, even if in the circumstances of this case TRW is held a governmental actor and Ma is held entitled to the presence of an attorney at the interview, these would be holdings of first impression and cannot be said to involve "firmly established" public policy so as to support a tort cause of action. (*Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 29 [267 Cal.Rptr. 618].) The trial court denied TRW's motion *in limine* on this point and entered an order that a well-established fundamental public policy was violated by TRW's conduct.

Because we hold, *ante,* that Ma did not have a constitutional right to bring his attorney to the interview, this alternative point would be moot but for the fact that the trial court entered a specific order thereon. In light of our disposition on the merits, this order should also be vacated.

### DISPOSITION

Having served its purpose, the order to show cause is discharged. Let a peremptory writ of mandate issue ordering respondent court to vacate its orders of June 16, 1992, which ruled, respectively, that (1) defendant TRW was a government actor with regard to the subject interview of plaintiff and (2) at the time defendant demanded plaintiff's submission to interrogation the right to counsel at a security interrogation, conducted in a custodial setting and focusing on the person as a criminal suspect, was clearly a well-established public policy and legal right, denial of which is a violation of the privilege against self-incrimination; and to vacate its statement of decision entered December 29, 1992, which ruled that plaintiff had a constitutional right to counsel at the subject interview; and to make a new and different order that defendant TRW, Inc., was not a government actor and that plaintiff did not have a constitutional right to counsel at the interview.

Hastings, J., concurred.

WOODS (A. M.), P. J., Concurring and Dissenting.—The well crafted opinion of the majority has persuaded me that Mr. Ma did not have the right

to insist upon having counsel present at the proposed meeting with TRW's security department. There is insufficient evidence to support the trial court's finding that the interrogation would have been sufficiently custodial so as to trigger Mr. Ma's Fifth Amendment right to counsel.

Ma's subjective fears that he might lose his job, his security clearance or be subjected to criminal prosecution if he attended the interview do not, in themselves, convert the interview into a custodial situation without some objective indicia that, had he attended, he would have been deprived of his freedom of movement. There is nothing in the record from which I can conclude that, had the interview fulfilled Ma's fears, he could not have simply declined to answer any further questions and left. I therefore concur in the disposition of the writ but I dissent from the majority's conclusion that TRW was not a government actor.

The United States Supreme Court's attempt to answer the question of when a private entity can be held to be a state actor has yielded a number of different tests and formulations. (See *Lugar* v. *Edmondson Oil Co.* (1982) 457 U.S. 922, 939 [73 L.Ed.2d 482, 495-496, 102 S.Ct. 2744].) Consistently, however, the court has emphasized that whatever test is used, the determination is necessarily a "fact-bound inquiry." (*Ibid.*; *Burton* v. *Wilmington Pkg. Auth.* (1961) 365 U.S. 715, 722 [6 L.Ed.2d 45, 50, 81 S.Ct. 856] ["Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."]; *Edmonson* v. *Leesville Concrete Co.* (1991) 500 U.S. 614, 620-622 [114 L.Ed.2d 660, 673-674, 111 S.Ct. 2077, 2083].)

In the recent *Edmonson* case, the Supreme Court set forth a two-part inquiry for determining when a private entity can be deemed a state actor for purposes of a claimed constitutional deprivation. "We [ask] first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority, [citation]; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor, [citation]." (*Edmonson* v. *Leesville Concrete Co.*, *supra*, 500 U.S. at p. 620 [114 L.Ed.2d at p. 673, 111 S.Ct. at pp. 2082-2083].) With respect to the second inquiry, the court suggested certain principles of general application. "[I]t is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits, [citations]; whether the actor is performing a traditional governmental function, [citations]; and whether the injury caused is aggravated in a unique way by the incidents of governmental authority, [citation]." (500 U.S. at pp. 621-622 [114 L.Ed.2d at p. 674, 111 S.Ct. at p. 2083].) Applying these principles to the facts of this case, I would conclude that the trial court correctly found TRW to be a state actor for purposes of Ma's claim that he was deprived of his Fifth Amendment right to counsel.

With respect to the first part of the inquiry, it is clear that TRW's investigation of Ma was pursuant to the exercise of a right originating in state authority. The requirement in paragraph 7(c) of the ISM that TRW initiate a preliminary inquiry to ascertain all the circumstances surrounding even the suspicion of the compromise of classified information was clearly a delegation of authority by the federal government to TRW in the defense of the country and its national security, an area over which the federal government exercises hegemony either directly or through its agents. (See *Becker* v. *Philco Corporation* (4th Cir. 1967) 372 F.2d 771 [defense contractor immune from libel suit of its employees for statements made by employer to United States under terms of a defense contract].)

With respect to the second part of the *Edmonson* inquiry, TRW's status as a defense contractor and the nature of its investigative obligations under the ISM are of such a nature that TRW can be fairly described as a state actor. *Edmonson* directs our consideration to three subfactors, the extent the private authority relies on governmental assistance and benefits; whether the entity is performing a traditional governmental function; and whether the claimed inquiry is aggravated in a unique way by the incidents of governmental authority. (*Edmonson Leesville Concrete Co., supra*, 500 U.S. at pp. 620-622 [114 L.Ed.2d at pp. 673-674, 111 S.Ct. at p. 2083].) In effect, these subfactors can be collapsed into a single question: Is the private entity performing a function traditionally performed by government for which it reaps a benefit? The answer here is yes. TRW is a defense contractor and reaps a financial benefit from this status. It is true, of course, that, without something more, "[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." (*Rendell-Baker* v. *Kohn* (1982) 457 U.S. 830 841 [73 L.Ed.2d 418, 427, 102 S.Ct. 2764].) The something more in this case is that the nature of TRW's work involves the defense of the country and its national security, a function traditionally the exclusive prerogative of the federal government. (*San Francisco Arts & Athletics* v. *U.S.O.C.* (1987) 483 U.S. 522, 544 [97 L.Ed.2d 427, 453, 107 S.Ct. 2971] ["This Court also has found action to be governmental action when the challenged entity performs functions that have been ' "traditionally the exclusive prerogative" ' of the Federal Government. [Citations.]" (Italics omitted.)]; *Becker* v. *Philco Corporation, supra*, 372 F.2d 771 [defense contractor immune from defamation action for statements made to the United States under defense contract].) Finally, the specific constitutional violation asserted by Ma of deprivation of his Fifth Amendment right to counsel flows from the investigative responsibilities imposed on TRW because the investigation was a first step that may have exposed Ma to federal criminal prosecution.

In this connection, I am not persuaded by the majority's assertion that because paragraph 7(c) of the ISM did not specify how the preliminary

inquiry was to be conducted, the inquiry did not qualify as state action. This is a distinction without a difference in view of the undisputed fact that the end result of the inquiry might be criminal prosecution. Additionally, *Rendell-Baker* v. *Kohn, supra,* 457 U.S. 830, on which the majority relies, is easily distinguishable on its facts as is *Blum* v. *Yaretsky* (1982) 457 U.S. 991 [73 L.Ed.2d 534, 102 S.Ct. 2777]. In neither case did the private entity fulfill the kind of traditional governmental function that was involved here nor were they obligated to perform policing tasks on behalf of the federal government.

I therefore dissent on this issue.

A petition for a rehearing was denied July 21, 1994, and the petition of real party in interest for review by the Supreme Court was denied September 15, 1994.

Pages 1316-1563:

(*Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.*[1]; *People* v. *Amador*[2]; *People* v. *Swain*[3]; *California School Employees Assn.* v. *Marin Community College Dist.*[4]; *Bewley* v. *Franchise Tax Bd.*[5]; *Nahrstedt* v. *Lakeside Village Condominium Assn.*[6]; *Montrose Chemical Corp.* v. *Admiral Ins. Co.*[7]; *Griset* v. *Fair Political Practices Com.*[8]; *People* v. *Vaughan*[9]; and *People* v. *Canady*[10])

REVIEWS GRANTED

---

[1]Reprinted without change in 30 Cal.App.4th 1117, to permit tracking pending review by the Supreme Court.

[2]Reprinted without change in 30 Cal.App.4th 1247, to permit tracking pending review by the Supreme Court.

[3]Reprinted without change in 30 Cal.App.4th 1461, to permit tracking pending review by the Supreme Court.

[4]See 8 Cal.4th 333 for Supreme Court opinion.

[5]Reprinted without change in 30 Cal.App.4th 1469, to permit tracking pending review by the Supreme Court.

[6]See 8 Cal.4th 361 for Supreme Court opinion.

[7]Reprinted without change in 30 Cal.App.4th 1474, to permit tracking pending review by the Supreme Court.

[8]See 8 Cal.4th 851 for Supreme Court opinion.

[9]Reprinted without change in 30 Cal.App.4th 1498, to permit tracking pending review by the Supreme Court.

[10]Reprinted without change in 30 Cal.App.4th 1508, to permit tracking pending review by the Supreme Court.